AN UNBORN CHILD, BY BRENDA WILCOX, ITS MOTHER AND NATURAL GUARDIAN, v. DELLA EVANS, SUCCESSOR IN INTEREST TO DECEASED, GEORGE H. EVANS, AND OTHERS.

245 N. W. 2d 600.

September 3, 1976—No. 46312.

*DeParcq, Anderson, Perl & Hunegs, Stephen S. Eckman, Gregory P. Joseph,* and *James R. Schwebel,* for appellant.

*Erickson & Casey, Carl E. Erickson,* and *John H. Erickson,* for respondents Evans.

*Doherty, Rumble & Butler, Boyd H. Ratchye,* and *George L. May,* for respondent insurance companies.

Heard before Otis, Peterson, Todd, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

The parties in this case dispute who is entitled to life insurance proceeds payable following the death of a state employee. The district court ordered summary judgment dismissing plaintiff's complaint. We reverse.

Mark Evans married Brenda Wilcox in July 1970, and in November he began working for the State of Minnesota as a rehabilitation counselor at the Brainerd State Hospital. In December 1970, Minnesota Mutual Life Insurance Company and Northwestern National Life Insurance Company (the insurers) issued Mark a certificate of participation in a group life insurance policy pursuant to a contract between the insurers and the state. The life insurance provided under the certificate was $25,000 with a double indemnity of $50,000 for accidental death. It provided in a substitute beneficiary clause that if no specific beneficiary was named, life insurance benefits would be paid according to the following order of priority:

"* * * 1. Your surviving lawful wife or husband; 2. Your surviving children in equal shares; 3. Your surviving parents in equal shares; 4. The duly appointed legal representative of your estate. 'Children' means only first generation lawful bodily issue and legally adopted persons."

Mark did not name a beneficiary. On February 7, 1972, Mark and Brenda were divorced.

It appears that Mark and Brenda reconciled their differences in March 1972 and shortly thereafter Brenda conceived a child by Mark. Mark admitted his responsibility for the conception, and Mark and Brenda planned to remarry. These facts were disputed by the parties, but for purposes of summary judgment only, the district court resolved them in favor of plaintiff.

Mark was fatally injured in an automobile accident in June 1972. Mark's parents, George and Della Evans, filed proof of death and a claim for the policy proceeds with the insurers, who paid them the $50,000 proceeds.[1] Brenda also claimed the proceeds on behalf of the unborn child, plaintiff in this case, who has since been born (on December 31, 1972) and is named Matthew Mark Wilcox. On September 29, 1972, Brenda initiated this suit on behalf of the child against the insurers and George and Della Evans, praying for an injunction against the dissipation of the proceeds by George and Della Evans, for an order that the proceeds be paid into the court, for an order asserting a constructive trust of the proceeds in favor of the child, and for an order requiring the distribution of the proceeds to the child. George and Della Evans answered that they had already spent $10,000 of the proceeds, but they paid the remaining $40,000 into court. The insurers cross-claimed against George and Della Evans seeking indemnity against them should the insurers be found liable to plaintiff. The district court on June 24, 1975,

---

[1] Viewing the evidence most favorably to plaintiff, it appears that before they paid the policy proceeds to defendants Evans, the insurers acquired actual knowledge that Mark had caused Brenda to become pregnant.

granted defendants' motion for summary judgment, and plaintiff subsequently appealed to this court from the judgment.

While the insurance policy has not been made part of the record in this case, the parties have treated the language in the certificate of participation issued to Mark Evans as controlling, and that certificate was before the court. None of the respondents has argued that the reference to "surviving children" of the insured in the substitute beneficiary clause means only those children who have been born as of the time of the insured's death, and indeed there is no reason it should be construed to disentitle posthumous children. Certainly no reason appears why the insured would have wanted to benefit a child born just before the insured's own death, yet disentitle a child born just after his own death. Minn. St. 525.171, relating to intestate succession, provides that "[a] posthumous child shall be considered as living at the death of its parent," and § 525.20, relating to testate disposition of property, includes within its purview posthumous children. The certificate similarly should be construed as treating posthumous children the same as children born before the death of the insured.

Plaintiff does argue he is a "surviving child" of Mark Evans within the meaning of the substitute beneficiary clause of the certificate of participation and that he therefore is entitled to the proceeds before Mark's parents. The clause, however, specifically provides that "children" means only first generation lawful bodily issue and legally adopted persons. Plaintiff is illegitimate and therefore not the lawful bodily issue of Mark Evans. The intent of the substitute beneficiary clause is therefore clearly to exclude him.

We turn to whether the equal protection clause of the Fourteenth Amendment precludes the denial to plaintiff of the insurance proceeds solely because of his illegitimacy. First it is necessary to determine whether plaintiff's entitlement to the proceeds under the substitute beneficiary clause is determined in this case solely according to his legitimacy or illegitimacy. In

most cases, if a legitimate child is born after the death of the insured father, the survivors of the insured will also include a "surviving lawful wife," and according to the substitute beneficiary clause the proceeds would be paid to her rather than to the legitimate child. In a rare case, however, it may happen that the wife of an insured would conceive just prior to the couple's obtaining a divorce. In such situation, if the insured father died before the birth of the child, he would be survived by a posthumous child who is his first generation lawful bodily issue, but he would not be survived by a lawful wife. The substitute beneficiary clause would in that case require payment to the surviving posthumous legitimate child, while in the case at bar it attempts to preclude payment to a surviving posthumous illegitimate child. We conclude, therefore, that the denial to plaintiff of the insurance proceeds is made solely according to his legitimacy or illegitimacy.

In order for plaintiff to successfully argue that a denial to him of the insurance proceeds violates his right to equal protection of the laws under the Fourteenth Amendment, it must first appear that such a denial occurred on some date when he had a right to equal protection. The equal protection clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This right may be claimed only by those who are "persons" within the meaning of the Fourteenth Amendment, and the United States Supreme Court has held that the word "person" as used in that amendment does not include the unborn. Roe v. Wade, 410 U. S. 113, 158, 93 S. Ct. 705, 729, 35 L. ed. 2d 147, 180 (1973). Thus the first point in time at which plaintiff could claim a Fourteenth Amendment right to equal protection of the laws was the date of his birth, December 31, 1972.

It is also essential to plaintiff's equal protection argument that, as of some date when he could claim the benefits of the equal protection clause, he was denied participation in the policy proceeds solely because of his illegitimacy. If at such time he was

denied participation for some other reason as well—some reason which is not objectionable under the equal protection clause—then he may not prevail. Plaintiff was in fact claiming the policy proceeds on December 31, 1972, and thereafter. Further, those proceeds were denied to him on that date and all subsequent dates. We may consider whether if plaintiff had made a claim for the policy proceeds on the date of his birth, December 31, 1972, he would have been denied participation in those proceeds even if he were legitimate (for example, if his claim was invalid because not made soon enough).

The certificate of participation provides that the requirements of a valid claim against the insurers include notice of injury within 30 days after the accident and affirmative proof of loss within 90 days after the date of loss. It further provides, however, that failure to give notice or furnish proof within the required time shall not invalidate a claim if action was not reasonably possible prior to the actual date of presentment.

Whether plaintiff, had he been legitimate, could have prevailed in a claim made for the first time on December 31, 1972, is a question of fact not addressed by the parties in the trial court. His claim would have been made more than 6 months after the date of the insured's death, yet perhaps such a delay would have been deemed "reasonable" within the meaning of the certificate of participation. The question is one of fact. Resolving it most favorably to the plaintiff, we may assume for purposes of reviewing the summary judgment that, had plaintiff been legitimate, he would have prevailed in a claim for the insurance proceeds made for the first time on the date of his birth.

We turn to whether the denial to plaintiff of participation in the insurance proceeds was a result of state action. The equal protection clause is directed to the states, and before it can be violated there must be state action which results in the alleged impermissible discrimination. As the United States Supreme Court once said:

"* * * The provisions of the Fourteenth Amendment are not confined to the action of the State through its legislature, or through the executive or judicial authority. Those provisions relate to and cover all the instrumentalities by which the State acts, and so it has been held that, whoever by virtue of public position under a state government, deprives another of any right protected by that amendment against deprivation by the State, violates the constitutional inhibition; and as he acts in the name of the State and for the State, and is clothed with the State's powers, his act is that of the State."

Raymond v. Chicago Union Traction Co. 207 U. S. 20, 35, 28 S. Ct. 7, 12, 52 L. ed. 78, 87 (1907).

In the case at bar, in 1965 the state by statute, Minn. St. 1965, § 43.43(f), created the State Employees Insurance Benefit Board (SEIBB), an instrumentality of the state, and the SEIBB then negotiated a contract with the insurers for insurance coverage of state employees.[2] It appears that in the negotiations it was the insurers who first proposed to discriminate between children of the insured depending on whether they were legitimate or illegitimate. The SEIBB, however, chose to execute the contract, thereby authorizing and in fact requiring the insurers to discriminate against illegitimate children. To the extent that it caused the discrimination against illegitimates, the SEIBB's execution of the insurance contract was state action for purposes of the Fourteenth Amendment. See, Burton v. Wilmington Parking Authority, 365 U. S. 715, 81 S. Ct. 856, 6 L. ed. 2d 45 (1961).

In the district court the parties did not fully develop what opportunity Mark Evans had to designate a beneficiary and thereby avoid the substitute beneficiary clause altogether. When this material fact is resolved, it may appear that he had no real opportunity to do so, and in that case the denial to plaintiff of any participation in the insurance proceeds would be a result of state

---

[2] The board's functions were transferred to the commissioner of personnel by L. 1973, c. 507, § 34.

action. If it appears, however, that Mark Evans had a full and adequate opportunity to designate a beneficiary or beneficiaries of his own choosing, and that it can fairly be said he adopted the substitute beneficiary clause as an expression of his own wish, then the denial to plaintiff of participation in the insurance benefits would not be the result of state action and would not offend the equal protection clause of the Fourteenth Amendment. For purposes of reviewing a summary judgment, we presume that all genuinely disputed issues of fact may be resolved in favor of the party against whom the judgment was rendered, and we therefore presume that the facts, when fully developed, would show that the denial to plaintiff of participation in the insurance proceeds resulted from state action.

Numerous times in the past decade the United States Supreme Court has heard argument and decided whether classifications made according to legitimacy or illegitimacy offend the equal protection clause. In Levy v. Louisiana, 391 U. S. 68, 88 S. Ct. 1509, 20 L. ed. 2d 436 (1968), the court held unconstitutional a wrongful death statute which allowed legitimate children compensation for the wrongful death of their mother but afforded no such right to illegitimate children for the wrongful death of their mother. The purpose of the statute was to compensate survivors for the injury they suffered as a result of the death of the decedent, and the court observed that both legitimate children and illegitimate children are injured equally by the death of their mother. In the companion case of Glona v. American Guar. & Lia. Ins. Co. 391 U. S. 73, 88 S. Ct. 1515, 20 L. ed. 2d 441 (1968), the court held unconstitutional a similar provision in the same statute which disallowed a mother's claim for the wrongful death of her child solely because the child was illegitimate. The court observed that while there may be a temptation to some to assert motherhood fraudulently, when the claimant is plainly the mother of the decedent the state denies equal protection of the laws if it withholds relief merely because the child who was wrongfully killed had been born to her out of wedlock.

In Labine v. Vincent, 401 U. S. 532, 91 S. Ct. 1017, 28 L. ed. 2d 288 (1971), the court considered the Louisiana intestate succession statute, which directed that an intestate's property be distributed to his legitimate children but not to his illegitimate children. In that case the court upheld the constitutionality of the statute, holding that the choices reflected by the intestate succession statute were choices which it was within the power of the state to make.

In Weber v. Aetna Cas. & Surety Co. 406 U. S. 164, 92 S. Ct. 1400, 31 L. ed. 2d 768 (1972), the court held unconstitutional a workers' compensation law which denied two children recovery for the death of their father. While they would have been allowed recovery if they had been either (1) dependent legitimate children, or (2) dependent acknowledged illegitimate children, they were denied recovery for the reason that they were dependent unacknowledged illegitimate children. Observing that "[a]n unacknowledged illegitimate child may suffer as much from the loss of a parent as a child born in wedlock or an illegitimate later acknowledged," 406 U. S. 169, 92 S. Ct. 1403, 31 L. ed. 2d 775, the court held that the discrimination offended the equal protection clause, citing Levy v. Louisiana, *supra*.[3] The court also limited Labine v. Vincent, *supra*, to its facts, noting that that case reflected in major part the traditional deference to a state's prerogative to regulate the disposition at death of property within its borders, and also that the decedent in Labine, unlike the decedent in Weber, might easily have modified his illegitimate child's rights under the Louisiana intestate succession law.

In Gomez v. Perez, 409 U. S. 535, 93 S. Ct. 872, 35 L. ed. 2d 56

---

[3] In a footnote the court recognized that the affinity and dependency on the father of the posthumously born illegitimate child are not comparable to those of offspring living at the time of their father's death. The court said, however, "We think a posthumously born illegitimate child should be treated the same as a posthumously born legitimate child, which the Louisiana statutes fail to do." Weber v. Aetna Cas. & Surety Co. 406 U. S. 164, 169, 92 S. Ct. 1400, 1404, 31 L. ed. 2d 768, 775.

(1973), a mother sought support from the father of her minor child, but the Texas courts denied her any relief because the child was illegitimate. The Supreme Court held the statutory scheme imposing an enforceable duty on a father to support his legitimate children, but not imposing a similar duty to support illegitimate children unconstitutional, holding that once a state posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother. The court recognized lurking problems with respect to proof of paternity and said that they should not be brushed aside. But neither, said the court, can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination. 409 U. S. 538, 93 S. Ct. 875, 35 L. ed. 2d 60.

In New Jersey Welfare Rights Organization v. Cahill, 411 U. S. 619, 93 S. Ct. 1700, 36 L. ed. 2d 543 (1973), appellants challenged the constitutionality of a New Jersey statute which provided financial and other assistance to families "which consists of a household composed of two adults of the opposite sex ceremonially married to each other who have at least one minor child * * * of both, the natural child of one and adopted by the other, or a child adopted by both * * *." Appellants argued that the challenged classification in practical effect almost invariably operated to deny benefits to illegitimate children while granting benefits to those children who are legitimate. By per curiam opinion the Supreme Court held that the decisions in Weber, Levy, and Gomez compel the conclusion that appellants' claim of the denial of equal protection must be sustained, "for there can be no doubt that the benefits extended under the challenged program are as indispensable to the health and well being of illegitimate children as to those who are legitimate." 411 U. S. 621, 93 S. Ct. 1701, 36 L. ed. 2d 545.

In Jimenez v. Weinberger, 417 U. S. 628, 94 S. Ct. 2496, 41 L. ed. 2d 363 (1974), the court struck down Federal legislation

on the ground that it constituted such a denial of equal protection as to offend the due process clause of the Fifth Amendment. The children of a disabled wage earner had sought benefits under the Social Security Act. As the court read the act, it divided illegitimate children born after the onset of the wage earner's disability into two subclasses. The first subclass comprised those (a) who could inherit under state intestacy laws, or (b) who were legitimated under state law, or (c) who were illegitimate only because of some formal defects in their parents' ceremonial marriage. The members of this subclass were deemed entitled to receive benefits under the act without any showing they were in fact dependent upon their disabled parent. The second subclass comprised those afterborn illegitimate children who were conclusively denied benefits because they did not fall within one of the foregoing categories and were not entitled to receive benefits under any other provision of the act.

Although the children argued in the Supreme Court that illegitimacy was a "suspect classification," the court specifically did not decide that issue, since the statute could be struck down under Weber simply because its classification was justified by no legitimate state interest, compelling or otherwise. The court recognized that the challenged provisions of the act were intended to prevent spurious claims, and that this is a legitimate governmental interest. It did not believe, however, that the blanket and conclusive exclusion of those afterborn illegitimates who were members of the second subclass was reasonably related to the prevention of spurious claims, since the potential for spurious claims was exactly the same for both subclasses.

Finally, in Mathews v. Lucas, 427 U. S. 495, 96 S. Ct. 2755, 49 L. ed. 2d 651 (1976), the court upheld the constitutionality of Federal legislation almost identical to that considered in Jimenez. The major difference was that while in Jimenez the disfavored illegitimates were conclusively presumed not to be dependent upon the disabled father and were therefore conclusively denied benefits under the Social Security Act, in Lucas the presump-

tion that the illegitimate children in this subclass were not dependent was rebuttable by actual proof of dependency. The court concluded that the statute in Lucas, unlike the statute considered in Jimenez, had as its purpose the provision of benefits based on a child's dependency on the wage earner and not on his being legitimate or within the favored subclass of illegitimate children. The court observed, moreover, that the presumptions of dependency accorded legitimate children and the favored subclass of illegitimate children, though they might approximate, rather than precisely mirror, the results that case-by-case adjudication would show, were permissible under the Fifth Amendment so long as the lack of precise equivalence did not exceed the bounds of substantiality tolerated by the applicable level of scrutiny. Reaching what was not reached in Jimenez, the court held that a classification according to legitimacy does not "command extraordinary protection from the majoritarian political process" so as to require the court's most exacting scrutiny—unlike, for example, a classification according to race. 427 U. S. 506, 96 S. Ct. 2762, 49 L. ed. 2d 661. The applicable level of scrutiny, rather, was an inquiry whether Congress' assumptions were so inconsistent as not to be reasonably supportive of its conclusions that individualized factual inquiry in order to isolate each nondependent child in a given class of cases is unwarranted as an administrative exercise. Based on such an inquiry, the Supreme Court concluded that the classification in Lucas according the presumption of dependency to legitimate children and the favored subclass of illegitimate children, while withholding that presumption from the other subclass of illegitimate children, did not impermissibly discriminate against the disfavored illegitimate children, since the classification was reasonably related to the likelihood of dependency on the deceased wage earner.

We conclude, on the basis of our analysis of the foregoing cases, that in the case at bar the classification of children of the insured according to whether they are legitimate or illegitimate is not reasonably related to a legitimate state interest. The state

has an interest in distributing the insurance proceeds to those who were dependent upon the deceased insured and who had a communion of love and affection with him. Whether an insured's child was born legitimately or illegitimately, however, does not determine whether the child is dependent on the insured, nor does it determine whether there will be bonds of love and affection between the child and the insured. The conclusive classification established by the substitute beneficiary clause is not, therefore, justified by this legitimate state interest.

The state, to be sure, has an interest in avoiding spurious claims by those who are not in fact children of the insured. While a spurious claimant's ability to defraud may be greater if he claims to be an illegitimate child rather than a legitimate child, this does not justify the erection of an impenetrable barrier against the claims of those who clearly are the illegitimate children of the insured. See, Gomez v. Perez, 409 U. S. 535, 538, 93 S. Ct. 872, 875, 35 L. ed. 2d 56, 60; Glona v. American Guar. & Lia. Ins. Co. 391 U. S. 73, 76, 88 S. Ct. 1515, 1517, 20 L. ed. 2d 441, 444.

The state, in addition, has an interest in making prompt payment to those who are entitled to the insurance proceeds. It may well in some cases require more time to locate and verify the identity of the illegitimate children of an insured than the same process requires for legitimate children. To assure promptness in payments, however, it is not reasonably necessary to completely bar illegitimates in general from receiving the insurance proceeds to which they would otherwise be entitled. An absolute bar suggests that the intent of the classification is something other than to provide for prompt payment of proceeds, for those illegitimate children whose identity is verifiable are excluded as well.

In the vast majority of instances, the identity of the rightful beneficiaries will be readily apparent even on the very date of the insured's death. Only in a minute fraction of cases will it be at all difficult to ascertain who is entitled to the proceeds under

the policy. Conceivably, in one of the latter cases, however, the wrong person may, because of the need for speedy payment to the beneficiaries, receive and dissipate the proceeds, necessitating an additional payment when the rightful beneficiary appears. For example, if the insurers paid out $25,000 of insurance proceeds to four known children of the insured before learning of the existence of a fifth, theretofore unknown, child, they would be required under the terms of the insurance contract to pay an additional $5,000 to the fifth child when he appeared (though they could, of course, enforce any available remedies to collect from the first four children that amount which was erroneously paid to them). The proceeds of the policy paid to the insured's parents in the case at bar have been only partially dissipated, for four-fifths of the total proceeds have been paid into court to await the outcome of this litigation.

It is not our task to select the administrative method which is best suited to accomplish the important state interest of prompt payment to the insured's beneficiaries in a manner that does not require invidious discrimination against some beneficiaries solely because of their status of birth. One possible solution to the problem, however, is for the insurers simply to take into account in their actuarial calculations and determination of the premium necessary to service the policy the possibility that additional payments will in some rare cases be required. The additional premium necessary would be in the nature of the insurers' own insurance against the risk of having to make multiple payments. Because the probability of multiple payment is so low, the additional premium necessary to cover the risk should be similarly small. In addition, beneficiaries would continue to receive speedy payment of policy proceeds, and there would be no discrimination among beneficiaries merely according to their status of birth.

Rule 56.03, Rules of Civil Procedure, provides that on a motion for summary judgment, judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and ad-

missions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law. If all genuinely disputed factual issues are eventually resolved in plaintiff's favor, then it appears he will be entitled to relief. Respondents are not, therefore, at this point in the litigation entitled to a judgment as a matter of law.

Reversed and remanded.