Lorna Lee HEPFEL, by her Guardian Ad Litem, Richard Hepfel, Respondent,

v.

Steven J. BASHAW, Petitioner.

Marjorie Caroline ERICKSON, Appellant,

v.

Mark Anthony STASSI, Respondent,

and

County of St. Louis, Appellant.

Nos. 46571, 48229.

Supreme Court of Minnesota.

April 20, 1979.

Ross A. Phelps, La Crescent, for Bashaw, petitioner.

Keith M. Brownell, County Atty., and Thomas F. Sjogren, Asst. County Atty., Duluth, for Erickson and County of St. Louis, appellants.

William V. Von Arx, County Atty., and Robert C. Youngerman, Asst. County Atty., Caledonia, for Hepfel.

Robert E. Lucas, Duluth, for Stassi.

Bruce A. Beneke and Thomas J. Barrett, Legal Assistance of Ramsey County, Inc., St. Paul, Thomas B. Humphrey, Jr., Anoka, C. Paul Jones, Public Defender, Minneapolis, for amicus curiae.

Heard before SHERAN, C. J., ROGOSHESKE, PETERSON, YETKA, and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

The appeal by the County of St. Louis and Marjorie Caroline Erickson, represented by the St. Louis County Attorney, was consolidated with *Hepfel v. Bashaw*, decided June 11, 1976, and now before the court on rehearing, to reconsider and determine the question of whether an indigent defendant in a paternity action is entitled to court-appointed counsel where the complainant mother is represented by the county attorney pursuant to Minn.St. 257.254.[1] Pending a legislative resolution, and in view of not only the mother's and putative father's interests but also of the developing and significant interest of an illegitimate child in

an accurate determination of paternity, in the exercise of our supervisory authority to ensure the fair administration of our adversary system of justice, we hold that counsel should be provided an indigent defendant who meets the eligibility standards currently required for proceedings in forma pauperis pursuant to Minn.St. 563.01.

In *Hepfel v. Bashaw*, complainant Lorna Lee Hepfel, represented by the Houston County Attorney pursuant to Minn.St.1976 § 257.254, commenced an action to have Steven J. Bashaw adjudicated the father of her child born out of wedlock. At the time the proceeding was commenced, Bashaw was an 18-year-old high school student with a part-time job. At oral argument it was claimed that Bashaw had been interviewed by a member of the county attorney's office and had been informed that, unless he signed an admission of paternity, a waiver of rights as a father, and a consent to future adoption, he would be charged with forcible rape.[2] Bashaw signed the admission and then, through an attorney who had been appointed to represent him as an indigent in an unrelated criminal matter, moved the district court on grounds of indigency and his denial of paternity to appoint counsel to represent him in the paternity proceeding. The motion was denied. In a per curiam opinion issued June 11, 1976, 279 N.W.2d 341, we directed on the facts peculiar to that case that the district court appoint counsel. The county attorney's petition for rehearing was granted October 18, 1976.

In *Erickson v. Stassi*, complainant Marjorie Caroline Erickson, also represented by the county attorney pursuant to the 1976 version of § 257.254, commenced an action to have Mark Anthony Stassi adjudicated the father of her child born out of wedlock.

---

1. Minn.St. 257.254 reads in part: "When requested to do so by a district or county court judge, public welfare or other social service agency, the county attorney may appear on behalf of and represent the complainant in all proceedings under sections 257.251 to 257.259, 257.261 to 257.264 and 257.27 to 257.33 and shall obtain and present such evidence as may

be necessary." Before 1977, the phrase "and in all other cases when the petitioner is unable to employ an attorney through inability to immediately pay for such services" followed the words "social service agency."

2. That claim has been denied by the county attorney's office.

Stassi was 24 years old at the time and was an airman first class in the Air Force. His net income was $364 per month. He had no expenses for food, rent, or medical needs; his other expenses, primarily payments on various installment purchases, totaled approximately $150 per month. Stassi was unable to obtain counsel through Legal Aid because his income was 50 percent above the poverty level as defined by Federal guidelines promulgated through the Community Services Administration. An assistant public defender appeared on his behalf before the district court and moved that counsel be provided. The court, relying on *Hepfel v. Bashaw* for authority to appoint counsel, found Stassi unable to "immediately pay for an attorney," granted the motion, and specified that the cost be paid by St. Louis County.

Although it is strenuously argued by defendants and amici that appointment of counsel to represent indigent defendants in paternity cases is constitutionally mandated by the equal-protection and due-process guarantees of the Federal and state constitutions, we decline to decide that issue, principally because our disposition authorizing appointment renders resolution of such a dubious contention unnecessary.

There is no statutory authority for appointment of counsel in a paternity proceeding. Section 257.254 provides that the complainant *may* be represented by the county attorney upon the request of "a district or county court judge, public welfare or other social service agency," but no comparable provision is made for the accused putative father. Section 563.01 authorizes proceedings in forma pauperis, but does not expressly include authorization for the court to appoint an attorney to represent an indigent. Thus, the issue is narrowed to whether an indigent defendant in a paternity action is entitled to court-appointed counsel despite the lack of statutory authorization.

Because the Fourteenth Amendment requires that an indigent criminal defendant be furnished with counsel if he is threatened with incarceration, *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), other states that have addressed this issue have primarily focused on the nature of the paternity proceeding. Where the proceeding is considered criminal or quasi-criminal in nature, the indigent paternity defendant has been supplied with counsel. See, e. g., *Artibee v. Cheboygan Circuit Judge*, 397 Mich. 54, 243 N.W.2d 248 (1976). On the other hand, where the action is considered civil in nature, counsel has been denied. See, e. g., *Miller v. Gordon*, 58 A.D.2d 1027, 397 N.Y.S.2d 500 (1977); *Ford v. Herndon*, 62 Cal.App.3d 492, 133 Cal.Rptr. 111 (1976).

In Minnesota it is unequivocally established that a paternity action is civil in nature. *Smith v. Bailen*, 258 N.W.2d 118 (Minn.1977). We are not persuaded, however, that the "civil" label attached to paternity adjudications dictates that the appointment of defense counsel be denied. In recent years we have given increased attention to the right to counsel in noncriminal proceedings. In *Prideaux v. State, Dept. of Public Safety*, 310 Minn. 405, 247 N.W.2d 385 (1976), for example, we held that, in view of the important constitutional rights that could be involved, the "civil" label attached to driver's license revocation was not dispositive, and we held that a person has a right to consult with a lawyer before deciding whether or not to submit to a blood-alcohol test. Similarly, the United States Supreme Court has determined that indigent juveniles must be provided with counsel in delinquency proceedings. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Also, a majority of the courts that have been faced with the question have held that indigent parents must be furnished with counsel in child dependency proceedings, despite the civil nature of the action. The states reaching this conclusion include, among others, Arkansas, California, Iowa, Maine, Michigan, New Jersey, New York, and Washington. See the cases col-

lected in *Davis v. Page*, 442 F.Supp. 258, 263, note 13 (S.D.Fla.1977).[3]

The right to counsel is not to be considered an end in itself. It is of value only to the extent that counsel can assist in the adversary nature of the proceeding to protect the interests of those involved. The desirability of the assistance of counsel in paternity proceedings depends in large part on the extent to which it will promote the accurate determination of paternity. Currently and especially in the trial of a contested paternity action, appallingly little attention is given to the accuracy of the determination. Professor Harry D. Krause, in a study of illegitimacy law and social policy, found that—

" * * * conviction rates reaching 95% are not uncommon in paternity actions. * * *

" 'Testimony from the sitting judiciary hearing paternity cases revealed to the Commission [Illinois Family Study Commission (1969)] that the evidence in most cases consists of an accusation by the woman and a denial by the defendant. Under such circumstances, the judges feel constrained to enter a finding of paternity. Not even the slightest corroborating evidence is required. * * * ' '

"In these circumstances, it is not surprising that a study based on blood tests indicated that in a group of 1,000 cases of disputed paternity, 39.6 per cent of the accused men were not actually the fathers of the children in question. The problem even reaches beyond *disputed* paternity matters: The putative father's admission that he is the father of a child is not necessarily credible. Again on the basis of blood tests, Sussman and Schatkin have estimated that fully 18 per cent of a group of men who voluntarily admit-

ted paternity were not in fact the fathers of the children in question. Combining these figures and applying them to 4,200 paternity cases that arose in New York City in 1959, Dr. Sussman estimated that as many as 645 men (more than one in seven) were erroneously held liable as the 'fathers' of someone else's children.

"In sum, current paternity prosecution practice in many metropolitan areas is abhorrent. Blackmail and perjury flourish, accusation is often tantamount to conviction, decades of support obligation are decided upon in minutes of court time and indigent defendants usually go without counsel or a clear understanding of what is involved." [4]

The paternity defendant, of course, has a substantial interest in the accuracy of the adjudication. He has a direct financial interest, for as an adjudicated father he will be ordered to contribute to the support of the child throughout its minority. Similarly, in light of recent case law, the adjudicated father's estate can also be burdened by the child's claims to inheritance, workers' compensation benefits, and insurance proceeds. See, e. g., Minn.St. 525.172; *Weber v. Anderson*, 269 N.W.2d 892 (Minn.1978); *An Unborn Child, by Wilcox v. Evans*, 310 Minn. 197, 245 N.W.2d 600 (1976), and the cases collected in Krause, *The Uniform Parentage Act*, 8 Fam.L.Q. 1, 2 to 8. In addition to his financial interests, the defendant, if found to be the father, is also indirectly threatened with loss of liberty, since incarceration may be imposed for criminal nonsupport under § 609.375. In case of such a criminal prosecution, however, counsel would be provided under the *Borst/Argersinger* rule.[5] Finally, the social stigma resulting from an adjudication of paternity cannot be ignored.

---

3. Minn.St. 260.155 and 260.231 require that counsel be provided parents unable to employ counsel in proceedings to terminate parental rights.

4. Krause, *Family Law*, p. 448, quoting from H. Krause, *Illegitimacy: Law and Social Policy*, p. 151.

5. *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). In *State v. Borst*, 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967), 5 years before the Supreme Court's holding in *Argersinger*, this court held that "[i]n the exercise of our supervisory power to insure the fair administration of justice," counsel should be provided in any case that could result in incarceration in a penal institution.

The motivation of the county and state on behalf of its welfare departments to insist that the determinations of paternity be made with care and precision is understandably apathetic, since its interest in the proceedings is primarily financial. As became apparent at oral argument, state involvement in a paternity action typically begins when the unwed mother applies for public assistance for herself and her child. The mother then assigns all of her rights to financial support from the adjudicated father to the department of social services and is expected, if not compelled, to cooperate in the determination, however vigorously disputed by the putative father, in order to remain eligible for assistance. Both of the cases before us fit this pattern. Thus, presently the welfare department, not the child or the mother, can potentially become the aggressive and predominant party in interest, emphasizing primarily its concern to find the man it can legally hold financially liable to reimburse it for the support expenses it incurs and, without the aid of blood tests, accepting, as current law allows, the uncorroborated testimony of the mother as sufficient proof of paternity. Because of the mounting number of illegitimate births and the attendant welfare burden, Federal law currently gives impetus to this approach to paternity determinations by denying Federal grants to states that fail to develop and implement plans requiring recipients of public aid to (1) assign to the state their rights of support from other persons and (2) cooperate with the state in establishing the paternity of a child for whom aid is sought. 42 U.S.C.A. §§ 602(a)(26) and 604. Furthermore, the state plan must provide that it will undertake to establish paternity under threat of the loss of Federal aid. 42 U.S.C.A. § 654(4).

In our view, improvements in this approach by which paternity is determined are long overdue. In recent years the right of illegitimate children to equal treatment under the law has been increasingly recognized. See, e. g., *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (holding that denying a child a judicially enforceable right to needed support simply because its natural father is not married to its mother is not constitutionally justifiable); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (holding that dependent, unacknowledged, illegitimate children are entitled to workers' compensation benefits following the death of their father, the same as legitimate children); *Glona v. American Guarantee & Liability Insurance Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (holding unconstitutional a statute denying a mother's recovery for the wrongful death of her illegitimate child); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (holding unconstitutional a statute denying an illegitimate child's recovery for the wrongful death of its mother). See, generally, Krause, *The Uniform Parentage Act*, 8 Fam.L.Q. 1, 2 to 7. The right to equal protection is meaningless if the initial determination of paternity is not made with care and precision.

Because the child's rights to inheritance, workers' compensation benefits, and insurance proceeds flow from an adjudication of paternity and because of the increasing recognition of the rights of an illegitimate child to equal treatment under the law, it must now be accepted that the child's interest in an accurate determination of paternity at least equals that of the putative father. Moreover, since the adjudicated father may also assert rights to custody superior to the rights of any person except the mother, *In re Shady*, 264 Minn. 222, 118 N.W.2d 449 (1962), and must give consent before the child can be adopted, Minn.St. 259.24 and 259.26, the child's interests may arguably exceed those of the putative father. Furthermore, if only because of their numbers, the rights of illegitimate children surely cannot be ignored. *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 Fam.L.Q. 247, 249 (1976) reports:

"* * * More than three hundred and ninety-eight thousand illegitimate children were added in 1970, 360,000 in

1969, 339,000 in 1968, 318,100 in 1967, 302,000 in 1966, for a total exceeding 1,700,000 in just these five years. Moreover, not only has there been an increase in the absolute number of illegitimate births, but the rate has been accelerating and now exceeds ten percent of all births. In many urban areas illegitimacy stands at forty percent and in some it exceeds fifty percent."

■ Because the protection of these significant and developing interests of the child depend on the accurate determination of paternity, it is unacceptable that paternity adjudications be handled as welfare subrogation claims, with the predominant interest properly represented before the court being that of the welfare board seeking its own reimbursement. The interests of the child, of course, might be best protected by its own legal counsel.[6] That issue, however, is not before us; and absent such a legislative approach and solution, it appears to us that the accurate determination of paternity, given the present adversary nature of the proceeding, is best promoted by a system that ensures the competent representation of both sides to the controversy. By analogy, the reason for representation, stated in the introduction to the A.B.A. Standards for Criminal Justice, Providing Defense Services (Approved Draft, 1968) at 2, applies to paternity proceedings:

" * * * Because society—not the defendant—has selected the adversary system as its choice of mechanism, our deliberate choice of that kind of system, rather than some notion of benevolence or gratuity to the poor, requires that both sides have professional spokesmen who

know the rules, i. e., that they be trained lawyers."

We suggest to the legislature that the correct adjudication of paternity could also be significantly furthered by providing for the availability and use of the blood-grouping tests currently available. A joint report of the American Medical Association and the American Bar Association recommends that a series of seven tests be performed in routine investigations of paternity. When all seven tests have been performed, "the cumulative probability that at least one of these tests will exclude paternity of a falsely accused man" exceeds 90 percent.[7] The AMA–ABA report also recommends the expanded application of serologic data to estimate the probability of paternity where the putative father has not been excluded by any of the seven recommended blood tests.[8] Thus, blood tests in combination with statistical studies may have probative value in affirmatively establishing paternity, in addition to their traditional value in proving the nonpaternity of a falsely accused man. Despite the potential of such thorough and reliable blood tests to render paternity proceedings relatively routine administrative determinations, it became apparent at oral argument that sophisticated blood tests are not regularly administered in this state, at least in the rural areas. Indeed, it was stated that the use of blood tests is viewed solely as a defensive tactic by the Houston County Attorney's office and is only allowed when requested and paid for by the defendant.[9] The scope and application of blood-grouping tests is not before us for decision. Nevertheless, the importance of blood tests magnifies the necessity for the timely assistance of counsel, to ensure that the defendant is apprised of his right to

---

6. See, e. g., Krause, *The Uniform Parentage Act*, 8 Fam.L.Q. 1, 9, 19, which provides that the child shall be made a party to the action, and that counsel shall be appointed for any party financially unable to obtain counsel.

7. *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 Fam.L.Q. 247, 258 (1976). The recommended serologic systems are: ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA. Id., 257.

8. Id., 260.

9. In contrast, it was stated at oral argument that St. Louis County routinely uses sophisticated blood tests in paternity adjudications. The tests are performed at War Memorial Hospital and can attain an exclusionary factor of 99.8 percent.

request blood tests and to inform him of their significance.[10]

We therefore hold, pursuant to our supervisory power to ensure the fair administration of justice, that in paternity adjudications counsel must be provided indigent defendants where the complainant is represented by the county attorney. We hold that counsel is required, not because we are constitutionally compelled to do so, but because, given the present adversary nature of paternity adjudications, there is no better method available to us to protect the important interests involved. It must be noted that the issue before us was narrowly limited to the right to counsel in paternity actions, which are, by their very nature, sui generis. Thus, our holding in no way affects the right of indigent defendants in other civil actions to court-appointed counsel.

It has come to our attention that the Uniform Parentage Act is currently before the Senate Judiciary Committee for its consideration. We applaud the efforts of the legislature to reexamine this entire area of the law and urge it to give particular attention to the routine implementation of blood tests in paternity determinations and to the adequate protection of the child's rights.

■ We next address the issue raised by *Erickson v. Stassi*: By what standard should the indigence of a paternity defendant be determined? The St. Louis County District Court determined that Stassi was entitled to court-appointed counsel as an indigent by applying a test formerly supplied by Minn.St.1976, § 257.254, to determine if the complainant should be represented by the county attorney by reason of "inability to immediately pay for such services."

Although it is clear from the record that Stassi was unable to immediately pay for his own legal counsel, we do not think that fact alone adequately establishes his indigence. All of Stassi's daily needs were furnished by the United States Air Force. Thus, he incurred no expenses for food, housing, or medical treatment. Stassi also was able to purchase nonessential items by using installment purchase plans, although he was not able to immediately pay for the items. We see no reason for a defendant in such circumstances to be provided with legal counsel and hold him ineligible as a matter of law.

Assuming that the legislature in addressing the questions presented to us in these cases determines that the adversary system for determining paternity should be retained and that counsel should be provided for indigent defendants, the question of establishing standards of eligibility for appointment of counsel in these noncriminal proceedings is, we acknowledge, clearly a legislative function. Pending legislative resolution, however, we must afford guidelines for the exercise of the trial court's discretionary authority to appoint counsel, since our determination of Stassi's ineligibility as a matter of law is clearly insufficient.

■ We believe, in the interests of uniformity, whether a defendant is indigent should be determined by application of the "substantial hardship" standard of Rule 5.02, Rules of Criminal Procedure, as implemented by the guidelines set forth in the advisory committee's commentary to that rule. Rules of Criminal Procedure, 299 Minn. 26 to 28.

We, therefore, affirm our initial decision in *Hepfel v. Bashaw* and reverse the order appointing counsel in *Erickson v. Stassi*.

---

10. Cf., *State on Behalf cf Ortloff v. Hanson*, 277 N.W.2d 205 (Minn.1979).