RAMSEY COUNTY PUBLIC DEFENDER'S OFFICE and Colia F. Ceisel, Assistant Ramsey County Public Defender, Petitioners,

v.

Hon. William J. FLEMING, Respondent.

Daniel Anthony BARTON, Petitioner,

v.

Hon. William J. FLEMING, et al., Respondents.

Nos. 50804, 50805.

Supreme Court of Minnesota.

April 18, 1980.

William E. Falvey, Chief, Public Defender, and Ellen Seesel, Sp. Asst. Public Defender, Ramsey County, St. Paul, for petitioners.

Warren Spannaus, Atty. Gen., and Kent G. Harbison, Sp. Asst. Atty. Gen., and Jane Prohaska, Asst. Atty. Gen., St. Paul, for respondent.

William R. Kennedy, Hennepin County Public Defender, and David Knutson, Asst. Public Defender, Minneapolis, Popham, Haik, Schnobrich, Kaufman & Doty and Larry D. Espel, Minneapolis, Linda Ojala, Legal Counsel, Minnesota Civil Liberties Union, Minneapolis, amicus curiae.

KELLY, Justice.

These consolidated cases are before us on petitions for writs of prohibition and mandamus. The petitioners seek an order directing respondent, the Honorable William J. Fleming, Judge of the Family Court Division of Ramsey County District Court, to fully advise all paternity defendants of their right to court-appointed counsel if indigent, and to formally determine their financial eligibility for appointed counsel before requiring them to admit or deny the allegation of paternity. They also ask for an order prohibiting respondent from interfering with the dissemination of letter notices to paternity defendants informing them of the right to court-appointed counsel. Additionally, petitioners Ceisel and the Ramsey County Public Defender's office seek an order vacating respondent's possible contempt citation entered against petitioner Ceisel on November 30, 1979. Petitioner Daniel Barton requests an order directing respondent to strike his "denial" of paternity in the case of *County of Ramsey v. Barton*. All writs will issue with the exception of petitioner Barton's request regard-

ing his "denial" of paternity, for the reasons hereinafter discussed.

In *Hepfel v. Bashaw*, 279 N.W.2d 342 (Minn.1979), we held that counsel must be provided indigent defendants in paternity adjudications where the complainant is represented by the County Attorney and we referred to Rule 5.02 of the Rules of Criminal Procedure which has to do with the appointment of attorneys for indigent defendants in criminal cases. Those rules provide that the court should determine indigency and shall have the power of appointment. Subdivision 4 of those rules provides that the inquiry to determine financial eligibility of a defendant for appointment of counsel shall be made when possible prior to the court appearance by such persons as the court may direct. In the matter at hand, no such prior arrangements had been made by the trial court.

The policy of Ramsey County District Court—Family Court Division in paternity proceedings requires a defendant to admit or deny the allegation of paternity before the court (1) advises him of his right to court-appointed counsel, (2) formally determines his eligibility for appointed counsel, and (3) appoints such counsel if he is indigent.

The Ramsey County Public Defender's office assumed the defense of indigents in paternity matters as requested by the Ramsey County Board in September 1979. After the Ramsey County District Court—Family Court Division's policy came to its attention, the Ramsey County Public Defender's office, in cooperation with the Ramsey County Attorney's office, prepared a form letter outlining an indigent paternity defendant's right to counsel. This letter was attached to the summons and complaint before service of process.

On November 30, 1979, petitioner Ceisel, Assistant Ramsey County Public Defender, appeared in Ramsey County District Court—Family Court Division, the Honorable William J. Fleming presiding, on behalf of two paternity defendants, Jose Aguirre and petitioner Daniel Barton, who were scheduled to make their first court appearances. Both defendants were interviewed by the Public Defender's office and they completed affidavits of indigency prior to this date. Both were accepted as clients by that office subject to the district court's determination of financial eligibility and formal appointment of counsel. Ceisel appeared first on behalf of petitioner Barton. She offered to the court an affidavit of indigency and Barton's 1978 Minnesota tax return. The court asked Barton several questions regarding his employment and advised Ceisel her request to appoint counsel would be taken under advisement. He then asked:

COURT: Is he here to deny this morning?

BARTON: Yes.

CEISEL: Your honor, it is my advice to him to do neither until he knows whether he is being represented by counsel.

COURT: It's your advice to do what?

CEISEL: To do neither until he knows whether or not he is being represented by counsel.

COURT: Okay. The matter may be considered. Continued one week.

After Aguirre's case was called, the court immediately asked petitioner Ceisel how the public defender's office knew about these matters. She informed the court that their office sent a form letter out with the summons and complaint. The court indicated that it disapproved of and intended to halt this practice. Petitioner Ceisel asked the court for Aguirre's file and the court ordered her to take her seat as it did not regard her as having any standing in the case. Ceisel requested the court to allow her to appear on behalf of Aguirre because he had not secured private counsel. She indicated she had with her an affidavit of indigency. The court again asked her to take a seat. The court then addressed Jose Aguirre. Ceisel again asked that Aguirre be given an opportunity to secure private counsel. The following parts of an exchange occurred:

COURT: Ms. Ceisel, I have asked you to take a seat in the courtroom. If you

choose not to do so, I am going to find you in direct contempt of the Court. Do you understand that?

MS. CEISEL: Yes, Your Honor, I do understand that.

COURT: Please take a seat in the courtroom.

(As Ms. Ceisel is turning to leave the bench, she leans toward Mr. Aguirre and whispers something to him. The Court Reporter is unable to hear any words spoken)

COURT: You are now found in contempt of court.

After a recess, the Court ordered Ceisel to appear on December 7, 1979, and made this statement:

COURT: Ms. Ceisel, would you approach the bench, please. I am directing you at this time to appear here next Friday morning and show cause why the Court shouldn't sentence you for contempt of court for failing to obey a direct order of this court to take your seat this morning; and further why I shouldn't find you in contempt for your continuing to talk after I had asked you to take your seat in the courtroom. And you may show what cause you have, if any, next Friday morning at 9:00 o'clock why I shouldn't impose a sentence upon you.

The first statement would indicate the court had found her in contempt. The second indicates he would have a hearing to determine that issue and that he had not actually found her in contempt of court. With these inconsistent statements facing us, we label the court's action as a possible contempt citation.

Barton, Ceisel and the Ramsey County Public Defender's office then filed petitions for writs of prohibition and mandamus. On December 5, 1979, this court stayed petitioner Ceisel's December 7th hearing for contempt, pending further order. On December 6, 1979, we ordered all paternity proceedings against petitioner Barton stayed. On December 13, 1979, this court

ordered these two cases consolidated and further ordered respondent to advise petitioner Barton of his right to court-appointed counsel, if indigent, and that if petitioner Barton requests court-appointed counsel, to determine his financial eligibility for such counsel before requiring him to admit or deny the complaint. Finally, we ordered respondent not to prohibit dissemination of letter notices to paternity defendants of their right to court-appointed counsel, if indigent, pending further order of this court.

Our decision in *Hepfel v. Bashaw*, 279 N.W.2d 342 (Minn.1979) was not constitutionally compelled. Instead it was based on our inherent supervisory power to insure the fair administration of justice and our view that the important interests involved in these adversarial proceedings are best promoted by competent representation of both parties in an adjudication of paternity. We did not specifically decide the stage at which the right to appointed counsel attaches in paternity proceedings.

"The right to counsel is not to be considered an end in itself. It is of value only to the extent that counsel can assist in the adversary nature of the proceeding to protect the interests of those involved." *Id.* at 345. We noted that these interests include both the child's and the defendant's interest in an accurate determination of paternity. The child's significant interests which flow from an adjudication of paternity include its rights to inheritance, workers' compensation and insurance proceeds.[1] The putative father has a direct pecuniary interest in the accuracy of the paternity proceedings. In addition, he is indirectly threatened with loss of liberty, since he can be incarcerated for nonsupport under Minn. Stat. § 609.375 (1978). Finally, we noted that the importance of blood tests magnifies the necessity of assistance of counsel. *Id.* at 345-7. The defendant should be apprised of his right to blood tests and informed of their significance. *Id.* at 347-8.

---

[1]. Here, as in the *Hepfel* case, we expressly reserve the issue of whether the child's interests might be best protected if it had its own

legal counsel. *Hepfel v. Bashaw*, 279 N.W.2d at 347.

This is particularly important because significant advances in a series of seven blood grouping tests have been made.[2]

█ We strongly believe that both the traditional and more recently developed sophisticated blood tests should be ordered whenever possible to obtain them in adjudications of paternity. This is not to say that their admissibility on various and sundry grounds may not be questioned. However, we need not decide that question in this case. Instead, we note the importance of these tests in connection with the need for counsel in paternity adjudications where the complainant is represented by the county attorney. Therefore, we hold that a defendant should be informed of his right to court-appointed counsel before he is required to admit or deny the allegation of paternity. If he requests appointed counsel, the court should formally determine his eligibility pursuant to the substantial hardship standard of R.Crim.Pro.R. 5.02. This is not to say that the court is precluded from accepting an admission of paternity after informing a defendant of his right to court-appointed counsel.[3] If, however, the defendant wishes to be represented by an attorney, the court shall determine whether he is indigent and, if so, shall appoint an attorney for him before requiring him to admit or deny the allegation of paternity.

█ We do not object to the agreement between the Ramsey County Attorney and the Public Defender's office whereby letter notices of the right of an indigent to the services of an attorney are distributed along with the summons and complaint. Ramsey County did agree to finance the cost of the public defender and the County

Attorney is its representative. No doubt the letter notice expedites the matter at trial.

█ Furthermore, the public defender's office may properly make an initial assessment of indigency and accompany a qualifying defendant to his first court appearance.[4] It is at this appearance that he must be informed by the court of his right to counsel and if he so requests and is eligible, the court must appoint counsel before requiring him to admit or deny the allegation. Thus, there is a conditional and tentative attorney-client relationship between the public defender and the defendant at the initial court appearance. This relationship is present and yet nevertheless tenuous because it is the court which formally and finally determines indigency and eligibility for appointment of counsel.

It is in light of the above principle that we consider the issue of Ceisel's contempt. A citation for contempt is a matter of the utmost seriousness to Ceisel. It may impair her prospects of being admitted to the bar of another state or limit her ability to gain new employment.

█ In *State v. Leftwich,* 41 Minn. 42, 45, 42 N.W. 598, 599 (1899), this court advised attorneys who are subject to a direct order against the interests of their client to obtain a formal ruling and to take an exception to that ruling. In our view, the record supports Ceisel's contention that she merely attempted to obtain a formal ruling as to whether she might represent defendant Aguirre and whether the court would grant a continuance so that Aguirre could obtain private counsel. Affidavits of persons present in the courtroom at the time of this

---

2. *Id.* at 347 n. 7.

3. The court could even order tests taken at this stage of the proceedings subject to a hearing or objection. The recently developed blood-grouping tests might promote accurate determinations of paternity. "The putative father's admission that he is the father of a child is not necessarily credible. Again on the basis of blood tests, Sussman and Schatkin have estimated that fully 18 per cent of a group of men who voluntarily admitted paternity were not in fact the fathers of the children in question." H.

Krause, *Family Law,* p. 448 quoting from H. Krause, *Illegitimacy: Law and Social Policy,* p. 151.

4. Although not directly applicable, we note with interest that Minn.Stat. § 611.18 (1978) allows a public defender on his or her own initiative to make an initial assessment of a criminal defendant's financial eligibility and to represent that defendant prior to any court appearance until the court formally determines financial eligibility and appoints counsel.

incident indicated that at no time was Ceisel disrespectful to the court when attempting to obtain the ruling and to take exception to it. Most importantly, Ceisel did not directly disobey the court's order to take a seat. The court did not order her to refrain from all interaction with Aguirre. Instead the court ordered her to sit down. Therefore, when she whispered to Aguirre on her way back to take a seat, she did not directly disobey an order of the court. Therefore, in view of the above factors, a writ will issue ordering that Ceisel not be held in contempt of court and that any possible citation for contempt be vacated.

We note that under Rule 5.02 of our Rules of Criminal Procedure and particularly subdivision 4 that the trial court had good reason to believe that it was his duty and obligation to not only determine indigency and appoint counsel but also if any prior inquiry was made as to indigency that the same would be done under his direction. We did not foresee that in Ramsey County a different arrangement would be made which requires no direction by the Court prior to the defendant's first appearance. The stance of the trial court in this case concerning the standing of counsel in the light of *Hepfel* and its reference to Rule 5.02 is understandable.

Finally, we deem it unnecessary to grant petitioner Barton's request to strike his "denial" of paternity because the record clearly indicates that Barton's "denial" of paternity was not formally entered on the record. Therefore, there is no entry to strike.

With the exception of petitioner Barton's request to strike his "denial" of paternity, the writs will issue.

So ordered.