# WEBER *v.* AETNA CASUALTY & SURETY CO.
## ET AL.

No. 70–5112.   Argued February 28, 1972—Decided April 24, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, WHITE, and MARSHALL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result, *post*, p. 176. REHNQUIST, J., filed a dissenting opinion, *post*, p. 177.

*Vanue B. Lacour* argued the cause and filed a brief for petitioner.

*W. Henson Moore* argued the cause and filed a brief for respondents.

*Norman Dorsen* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

MR. JUSTICE POWELL delivered the opinion of the Court.

The question before us, on writ of certiorari to the Supreme Court of Louisiana,[1] concerns the right of dependent unacknowledged, illegitimate children to recover under Louisiana workmen's compensation laws benefits for the death of their natural father on an equal footing with his dependent legitimate children. We hold that Louisiana's denial of equal recovery rights to dependent unacknowledged illegitimates violates the Equal Protection Clause of the Fourteenth Amendment. *Levy* v. *Louisiana,* 391 U. S. 68 (1968); *Glona* v. *American Guarantee & Liability Insurance Co.,* 391 U. S. 73 (1968).

On June 22, 1967, Henry Clyde Stokes died in Louisiana of injuries received during the course of his employment the previous day. At the time of his death Stokes resided and maintained a household with one Willie Mae Weber, to whom he was not married. Living in the household were four legitimate minor children, born of the marriage between Stokes and Adlay Jones Stokes who was at the time committed to a mental hospital. Also living in the home was one unacknowledged illegitimate child born of the relationship between Stokes and Willie Mae Weber. A second illegitimate child of Stokes and Weber was born posthumously.

On June 29, 1967, Stokes' four legitimate children, through their maternal grandmother as guardian, filed a claim for their father's death under Louisiana's work-

---

[1] *Stokes* v. *Aetna Casualty & Surety Co.,* 257 La. 424, 242 So. 2d 567 (1970).

men's compensation law.[2]  The defendant employer and its insurer impleaded Willie Mae Weber who appeared and claimed compensation benefits for the two illegitimate children.

Meanwhile, the four legitimate children had brought another suit for their father's death against a third-party tortfeasor, which was settled for an amount in excess of the maximum benefits allowable under workmen's compensation.  The illegitimate children did not share in this settlement.  Subsequently, the employer

[2] La. Rev. Stat. § 23:1232 (1967) establishes the schedule of payment of workmen's compensation benefits to various classifications of dependents as follows:

"Payment to dependents shall be computed and divided among them on the following basis:

"(1) If the widow or widower alone, thirty-two and one-half per centum of wages.

"(2) If the widow or widower and one child, forty-six and one-quarter per centum of wages.

"(3) If the widow or widower and two or more children, sixty-five per centum of wages.

"(4) If one child alone, thirty-two and one-half per centum of wages of deceased.

"(5) If two children, forty-six and one-quarter per centum of wages.

"(6) If three or more children, sixty-five per centum of wages.

"(7) If there are neither widow, widower, nor child, then to the father or mother, thirty-two and one-half per centum of wages of the deceased.  If there are both father and mother, sixty-five per centum of wages.

"(8) If there are neither widow, widower, nor child, nor dependent parent entitled to compensation, then to one brother or sister, thirty-two and one-half per centum of wages with eleven per centum additional for each brother or sister in excess of one.  If other dependents than those enumerated, thirty-two and one-half per centum of wages for one, and eleven per centum additional for each such dependent in excess of one, subject to a maximum of sixty-five per centum of wages for all, regardless of the number of dependents."

in the initial action requested the extinguishment of all parties' workmen's compensation claims by reason of the tort settlement.

The trial judge awarded the four legitimate children the maximum allowable amount of compensation and declared their entitlement had been satisfied from the tort suit settlement. Consequently, the four legitimate children dismissed their workmen's compensation claim. Judgment was also awarded to Stokes' two illegitimate offspring to the extent that maximum compensation benefits were not exhausted by the four legitimate children. Since such benefits had been entirely exhausted by the amount of the tort settlement, in which only the four dependent legitimate offspring participated, the two dependent illegitimate children received nothing.

I

For purposes of recovery under workmen's compensation, Louisiana law defines children to include "only legitimate children, stepchildren, posthumous children, adopted children, and illegitimate children acknowledged under the provisions of Civil Code Articles 203, 204, and 205." [3] Thus, legitimate children and acknowledged ille-

---

[3] La. Rev. Stat. § 23:1021 (3). The relevant provisions for acknowledgment of an illegitimate child are as follows:

La. Civ. Code, Art. 202 (1967):

"Illegitimate children who have been acknowledged by their father, are called natural children; those who have not been acknowledged by their father, or whose father and mother were incapable of contracting marriage at the time of conception, or whose father is unknown, are contradistinguished by the appellation of bastards."

La. Civ. Code, Art. 203:

"The acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public, in presence of two witnesses, by the father and mother or either of them, whenever it

gitimates may recover on an equal basis. Unacknowledged illegitimate children, however, are relegated to the lesser status of "other dependents" under § 1232 (8) of the workmen's compensation statute [4] and may recover *only* if there are not enough surviving dependents in the preceding classifications to exhaust the maximum allowable benefits. Both the Louisiana Court of Appeal [5] and a divided Louisiana Supreme Court [6] sustained these statutes over petitioner's constitutional objections, holding that our decision in *Levy, supra,* was not controlling.

We disagree. In *Levy,* the Court held invalid as denying equal protection of the laws, a Louisiana statute which barred an illegitimate child from recovering for the wrongful death of its mother when such recoveries by legitimate children were authorized. The Court there decided that the fact of a child's birth out of wedlock bore no reasonable relation to the purpose of wrongful-death statutes which compensate children for the death of a mother. As the Court said in *Levy:*

> "Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. These children, though illegitimate, were dependent on her; she cared for them and nurtured them; they were indeed hers in the biological and in the spiritual sense; in her death they suffered wrong in the sense that any dependent would." *Levy* v. *Louisiana,* 391 U. S., at 72.

shall not have been made in the registering of the birth or baptism of such child."

La. Civ. Code, Art. 204:

"Such acknowledgment shall not be made in favor of children whose parents were incapable of contracting marriage at the time of conception; however, such acknowledgment may be made if the parents should contract a legal marriage with each other."

[4] See n. 2, *supra.*

[5] 232 So. 2d 328 (La. App. 1969).

[6] *Stokes* v. *Aetna Casualty & Surety Co.,* see n. 1, *supra.*

The court below sought to distinguish *Levy* as involving a statute which absolutely excluded *all* illegitimates from recovery, whereas in the compensation statute in the instant case acknowledged illegitimates may recover equally with legitimate children and "the unacknowledged illegitimate child is not *denied* a right to recover compensation, he being merely relegated to a less favorable position as are other dependent relatives such as parents . . . ." *Stokes* v. *Aetna Casualty & Surety Co.*, 257 La. 424, 433–434, 242 So. 2d 567, 570 (1970). The Louisiana Supreme Court likewise characterized *Levy* as a tort action where the tortfeasor escaped liability on the fortuity of the potential claimant's illegitimacy, whereas in the present action full compensation was rendered, and "no tort feasor goes free because of the law." *Id.*, at 434, 242 So. 2d, at 570.

We do not think *Levy* can be disposed of by such finely carved distinctions. The Court in *Levy* was not so much concerned with the tortfeasor going free as with the equality of treatment under the statutory recovery scheme. Here, as in *Levy*, there is impermissible discrimination. An unacknowledged illegitimate child may suffer as much from the loss of a parent as a child born within wedlock or an illegitimate later acknowledged. So far as this record shows, the dependency and natural affinity of the unacknowledged illegitimate children for their father were as great as those of the four legitimate children whom Louisiana law has allowed to recover.[7] The legitimate children and the illegitimate children all lived in the home of the deceased and were

---

[7] The affinity and dependency on the father of the posthumously born illegitimate child are, of course, not comparable to those of offspring living at the time of their father's death. This fact, however, does not alter our view of the case. We think a posthumously born illegitimate child should be treated the same as a posthumously born legitimate child, which the Louisiana statutes fail to do.

equally dependent upon him for maintenance and support. It is inappropriate, therefore, for the court below to talk of relegating the unacknowledged illegitimates "to a less favorable position as are other dependent relatives such as parents." The unacknowledged illegitimates are *not* a parent or some "other dependent relative"; in this case they are *dependent children,* and as such are entitled to rights granted other *dependent children.*

Respondents contend that our recent ruling in *Labine* v. *Vincent,* 401 U. S. 532 (1971), controls this case. In *Labine,* the Court upheld, against constitutional objections, Louisiana intestacy laws which had barred an acknowledged illegitimate child from sharing equally with legitimate children in her father's estate. That decision reflected, in major part, the traditional deference to a State's prerogative to regulate the disposition at death of property within its borders. *Id.,* at 538. The Court has long afforded broad scope to state discretion in this area.[8] Yet the substantial state interest in providing for "the stability of . . . land titles and in the prompt and definitive determination of the valid ownership of property left by decedents," *Labine* v. *Vincent,* 229 So. 2d 449, 452 (La. App. 1969), is absent in the case at hand.

Moreover, in *Labine* the intestate, unlike deceased in the present action, might easily have modified his daughter's disfavored position. As the Court there remarked:

"Ezra Vincent could have left one-third of his property to his illegitimate daughter had he bothered

---

[8] The Court over a century ago voiced strong support for state powers over inheritance: "Now the law in question is nothing more than an exercise of the power which every state and sovereignty possesses, of regulating the manner and term upon which property real or personal within its dominion may be transmitted by last will and testament, or by inheritance; and of prescribing who shall and who shall not be capable of taking it." *Mager* v. *Grima,* 8 How. 490, 493 (1850). See *Lyeth* v. *Hoey,* 305 U. S. 188, 193 (1938).

.

to follow the simple formalities of executing a will. He could, of course, have legitimated the child by marrying her mother in which case the child could have inherited his property either by intestate succession or by will as any other legitimate child." *Labine, supra,* at 539.

Such options, however, were not realistically open to Henry Stokes. Under Louisiana law he could not have acknowledged his illegitimate children even had he desired to do so.[9] The burdens of illegitimacy, already weighty, become doubly so when neither parent nor child can legally lighten them.

Both the statute in *Levy* and the statute in the present case involve state-created compensation schemes, designed to provide close relatives and dependents of a deceased a means of recovery for his often abrupt and accidental death. Both wrongful-death statutes and workmen's compensation codes represent outgrowths and modifications of our basic tort law. The former alleviated the harsh common-law rule under which "no person could inherit the personal right of another to recover for

---

[9] La. Civ. Code, Art. 204, see n. 3, *supra,* prohibits acknowledgment of children whose parents were incapable of contracting marriage at the time of conception. Acknowledgment may only be made if the parents could contract a legal marriage with each other. Decedent in the instant case remained married to his first wife— the mother of his four legitimate children—until his death. Thus, at all times he was legally barred from marrying Willie Mae Weber, the mother of the two illegitimate children. It therefore was impossible for him to acknowledge legally his illegitimate children and thereby qualify them for protection under the Louisiana Workmen's Compensation Act. See also *Williams* v. *American Emp. Ins. Co.,* 237 La. 101, 110 So. 2d 541 (1959), where the Louisiana Supreme Court held that a posthumously born illegitimate child cannot be classified as a child entitled to workmen's compensation benefits, as defined under La. Rev. Stat. §23:1021 (3).

tortious injuries to his body"; [10] the latter removed difficult obstacles to recovery in work-related injuries by offering a more certain, though generally less remunerative, compensation. In the instant case, the recovery sought under the workmen's compensation statute was in lieu of an action under the identical death statute which was at issue in *Levy*.[11] Given the similarities in the origins and purposes of these two statutes, and the similarity of Louisiana's pattern of discrimination in recovery rights, it would require a disregard of precedent and the principles of *stare decisis* to hold that *Levy* did not control the facts of the case before us. It makes no difference that illegitimates are not so absolutely or broadly barred here as in *Levy;* the discrimination remains apparent.

## II

Having determined that *Levy* is the applicable precedent, we briefly reaffirm here the reasoning which produced that result. The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. *Morey* v. *Doud,* 354 U. S. 457 (1957); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Gulf, Colorado & Santa Fé R. Co.* v. *Ellis,* 165 U. S. 150 (1897); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886). Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny, *Brown* v. *Board of Education,* 347 U. S. 483 (1954); *Harper* v. *Virginia Board of Elections,* 383 U. S.

---

[10] See 391 U. S. 73, 76 (1968) (Harlan, J., dissenting in *Glona* v. *American Guarantee & Liability Insurance Co.,* and *Levy* v. *Louisiana*).

[11] La. Civ. Code, Art. 2315.

663 (1966). The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?

The Louisiana Supreme Court emphasized strongly the State's interest in protecting "legitimate family relationships," 257 La., at 433, 242 So. 2d, at 570, and the regulation and protection of the family unit have indeed been a venerable state concern. We do not question the importance of that interest; what we do question is how the challenged statute will promote it. As was said in *Glona:*

> "[W]e see no possible rational basis . . . for assuming that if the natural mother is allowed recovery for the wrongful death of her illegitimate child, the cause of illegitimacy will be served. It would, indeed, be farfetched to assume that women have illegitimate children so that they can be compensated in damages for their death." *Glona* v. *American Guarantee & Liability Insurance Co., supra,* at 75.

Nor can it be thought here that persons will shun illicit relations because the offspring may not one day reap the benefits of workmen's compensation.

It may perhaps be said that statutory distinctions between the legitimate and illegitimate reflect closer family relationships in that the illegitimate is more often not under care in the home of the father nor even supported by him. The illegitimate, so this argument runs, may thus be made less eligible for the statutory recoveries and inheritances reserved for those more likely to be within the ambit of familial care and affection. Whatever the merits elsewhere of this contention, it is not compelling in a statutory compensation scheme where dependency on the deceased is a prerequisite to anyone's recovery,

and where the acknowledgment so necessary to equal recovery rights may be unlikely to occur or legally impossible to effectuate even where the illegitimate child may be nourished and loved.

Finally, we are mindful that States have frequently drawn arbitrary lines in workmen's compensation and wrongful-death statutes to facilitate potentially difficult problems of proof. Nothing in our decision would impose on state court systems a greater burden in this regard. By limiting recovery to dependents of the deceased, Louisiana substantially lessens the possible problems of locating illegitimate children and of determining uncertain claims of parenthood.[12] Our decision fully

---

[12] The most relevant sections of the Louisiana statutes defining dependency for purposes of workmen's compensation recovery read as follows:

La. Rev. Stat. § 23:1231:

"For injury causing death within two years after the accident there shall be paid to the legal dependent of the employee, actually and wholly dependent upon his earnings for support at the time of the accident and death, a weekly sum as hereinafter provided, for a period of four hundred weeks. . . ."

La. Rev. Stat. § 23:1251:

"The following persons shall be conclusively presumed to be wholly and actually dependent upon the deceased employee:

.            .            .            .            .

"(3) A child under the age of eighteen years . . . upon the parent with whom he is living at the time of the injury of the parent."

The above section thus qualifies the illegitimate children in this case as dependents.

La. Rev. Stat. § 23:1252:

"In all other cases, the question of legal and actual dependency in whole or in part, shall be determined in accordance with the facts as they may be at the time of the accident and death . . . ."

Naturally, the variations of dependency claims coming to Louisiana courts under these sections are many, but Louisiana has consistently required valid evidence of dependency for recovery. See, e. g., Sandidge v. Aetna Casualty & Surety Co., 29 So. 2d 522 (La.

respects Louisiana's choice on this matter. It will not expand claimants for workmen's compensation beyond those in a direct blood and dependency relationship with the deceased and it avoids altogether diffuse questions of affection and affinity which pose difficult probative problems. Our ruling requires equality of treatment between two classes of persons the genuineness of whose claims the State might in any event be required to determine.

The state interest in legitimate family relationships is not served by the statute; the state interest in minimizing problems of proof is not significantly disturbed by our decision. The inferior classification of dependent unacknowledged illegitimates bears, in this instance, no significant relationship to those recognized purposes of recovery which workmen's compensation statutes commendably serve.

The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust.[13] Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent

App. 1947), where children, living with their mother who was separated from the father, in order to receive the maximum compensation for the father's death, must establish that they were wholly dependent upon the father for their support.

[13] See, e. g., Gray & Rudovsky, The Court Acknowledges the Illegitimate: *Levy* v. *Louisiana* and *Glona* v. *American Guarantee & Liability Insurance Co.*, 118 U. Pa. L. Rev. 1 (1969). A comprehensive study of the legal status of illegitimacy and the effects thereof is H. Krause, Illegitimacy: Law and Social Policy (1971); reviewed by Wadlington, 58 Va. L. Rev. 188 (1972).

the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth [14] where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN, concurring in the result.

For me, La. Civ. Code, Art. 204, is the provision in the State's statutory structure that proves fatal for this workmen's compensation case under the focus of constitutional measurement. The Article operated to deny Henry Stokes the ability even to acknowledge his illegitimates so that they might qualify as children within the definition provided by La. Rev. Stat. § 23:1021 (3). This is so because the decedent (inasmuch as he was then married to Adlay Jones Stokes and remained married to her the rest of his life) and the mother were incapable of contracting marriage at the time of conception and thereafter. This bar, indeed, under the Court's decided cases, denied equal protection to the illegitimates. Cf. *Labine* v. *Vincent,* 401 U. S. 532, 539 (1971).

I thus give primary emphasis to the presence of Art. 204 and, I believe, far more emphasis than does the Court. If that statute did not exist or were inapplicable, the case might be a different one. While the Court refers to Art. 204, and to a degree relies upon it, *ante,* at 171 n. 9, it seems to me that it does so only secondarily. I read the opinion as flatly granting dependent unacknowledged illegitimate children full equality with dependent legitimate children and therefore as striking down the Lou-

---

[14] See *Graham* v. *Richardson,* 403 U. S. 365 (1971); *Hunter* v. *Erickson,* 393 U. S. 385 (1969); *Brown* v. *Board of Education,* 347 U. S. 483 (1954); and see also *Hirabayashi* v. *United States,* 320 U. S. 81 (1943).

isiana statutory scheme even for the situation where the father has the power to acknowledge his illegitimates but refrains from doing so. In other words, the Court holds the Louisiana system unconstitutional with respect to illegitimate dependent children wholly apart from the barrier of Art. 204. Certainly, the first paragraph of the opinion is to this effect.

In deciding this case, I need not, and would not, go that far. I would let the resolution of that issue await its appropriate presentation.

MR. JUSTICE REHNQUIST, dissenting.

This case is distinguishable from *Levy* v. *Louisiana*, 391 U. S. 68 (1968), and could be decided the other way on the basis of this Court's more recent decision in *Labine* v. *Vincent*, 401 U. S. 532 (1971). Yet I certainly do not regard the Court's decision as an unreasonable drawing of the line between *Levy* and *Labine*, and would not feel impelled to dissent if I regarded *Levy* as rightly decided. I do not so regard it. I must agree with Mr. Justice Harlan's dissenting opinion, which described *Levy* and its companion case, *Glona* v. *American Guarantee & Liability Insurance Co.*, 391 U. S. 73 (1968), as "constitutional curiosities," and called the Court's method of reaching the result "a process that can only be described as brute force." *Id.*, at 76.

Since *Levy* was a constitutional holding, its doctrine is open to later re-examination to a greater extent than if it had decided a question of statutory construction or some other nonconstitutional issue. See *Coleman* v. *Alabama*, 399 U. S. 1, 22 (1970) (BURGER, C. J., dissenting); *Boys Markets, Inc.* v. *Retail Clerks Union*, 398 U. S. 235, 259 (1970) (Black, J., dissenting); *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 405–410 (1932) (Brandeis, J., dissenting).

The Equal Protection Clause was adopted as a part of the Fourteenth Amendment in 1868. Five years later Mr. Justice Miller delivered this Court's initial construction of that amendment in his classic opinion in *Slaughter-House Cases*, 16 Wall. 36 (1873). After setting forth an account of the adoption of that amendment, he described the account as a "recapitulation of events, almost too recent to be called history, but which are familiar to us all." 16 Wall., at 71. Referring to the Equal Protection Clause, he said:

> "We doubt very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision." 16 Wall., at 81.

In nearly 100 years of subsequent adjudication concerning this clause, the Court has adhered to the notion expressed in the *Slaughter-House Cases* that racial classifications are "suspect." See, *e. g., Loving* v. *Virginia*, 388 U. S. 1 (1967). But during that same period of time, this Court has proved Mr. Justice Miller a bad prophet with respect to nonracial classification.

As noted in *Levy,* in the field of economic and social legislation, the Court has given great latitude to the legislatures in making classifications. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955); *Morey* v. *Doud,* 354 U. S. 457 (1957). The test has been whether there is any rational basis for the legislative classification. See *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 556 (1947). "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U. S. 420, 425–426

(1961). Under this test, so long as the "discrimination is founded upon a reasonable distinction, or difference in state policy," *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 528 (1959), the Court will not attempt to weigh its social value or determine whether the classification might have been more finely drawn. *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963). However, this salutary principle has been departed from by the Court in recent years, as pointed out in its opinion here, where the Court has felt that the classification has affected what it conceives to be "fundamental personal rights."

The difficulty with this approach, devoid as it is of any historical or textual support in the language of the Equal Protection Clause, is that it leaves apparently to the Justices of this Court the determination of what are, and what are not, "fundamental personal rights." Those who framed and ratified the Constitution and the various amendments to it chose to select certain particular types of rights and freedoms, and to guarantee them against impairment by majority action through legislation or otherwise. While the determination of the extent to which a right is protected may result in the drawing of fine lines, the fundamental sanction of the right itself is found in the language of the Constitution, and not elsewhere. The same is unfortunately not true of the doctrine of "fundamental personal rights." This body of doctrine created by the Court can only be described as a judicial superstructure, awkwardly engrafted upon the Constitution itself.

The Court's experience with similar superstructures has not been a happy one. The first part of this century saw the evolution of the doctrine of "freedom of contract" which was held by the Court during part of that time to be a part of the Fourteenth Amendment's requirement that no person be deprived of life, liberty, or property without due process of law. This doctrine

had its just deserts in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 391 (1937), where Mr. Chief Justice Hughes, speaking for the Court, said:

> "The constitutional provision invoked is the due process clause of the Fourteenth Amendment governing the States, as the due process clause invoked in the *Adkins* case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law."

In a similar vein it may be said that the Constitution does not speak of "fundamental personal rights," but speaks of the equal protection of the laws and prohibits the denial thereof. Two years ago, this Court in *Dandridge* v. *Williams,* 397 U. S. 471 (1970), recognized that the broad latitude accorded state legislatures by both the contemporary history and the text of the Equal Protection Clause was not limited to statutes regulating business or industry. There, in a case dealing with the administration of public welfare assistance which, the Court noted, "involves the most basic economic needs of impoverished human beings," the Court nonetheless quite properly applied the "rational basis" constitutional standard. 397 U. S., at 485. It reaffirmed the historically correct statement of the meaning of equal protection in these words:

> "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with

mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago*, 228 U. S. 61, 69–70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan* v. *Maryland,* 366 U. S. 420, 426."

The Court in today's opinion, recognizing that two different standards have been applied in equal protection cases, apparently formulates a hybrid standard which is the basis of decision here. The standard is a two-pronged one:

"What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?"

Surely there could be no better nor more succinct guide to sound legislation than that suggested by these two questions. They are somewhat less useful, however, as guides to constitutional adjudication. How is this Court to determine whether or not a state interest is "legitimate"? And how is the Court to know when it is dealing with a "fundamental personal right"?

While the Court's opinion today is by no means a sharp departure from the precedents on which it relies, it is an extraordinary departure from what I conceive to be the intent of the framers of the Fourteenth Amendment and the import of the traditional presumption of constitutionality accorded to legislative enactments. Nowhere in the text of the Constitution, or in its plain implications, is there any guide for determining what is a "legitimate" state interest, or what is a "fundamental personal right." The traditional police power of the

States has been deemed to embrace any measure thought to further the well-being of the State in question, subject only to the specific prohibitions contained in the Federal Constitution. That Constitution of course contains numerous guarantees of individual liberty, which I would have no trouble describing as "fundamental personal liberties," but the right of illegitimate children to sue in state court to recover workmen's compensation benefits is not among them.

The relationship of the "legitimate" state interest and "fundamental personal right" analysis to the constitutional guarantee of equal protection of the law is approximately the same as that of "freedom of contract" to the constitutional guarantee that no person shall be deprived of life, liberty, or property without due process of law. It is an invitation for judicial exegesis over and above the commands of the Constitution, in which values that cannot possibly have their source in that instrument are invoked to either validate or condemn the countless laws enacted by the various States. In refusing to accept the breadth of meaning of the Fourteenth Amendment urged upon the Court in the *Slaughter-House Cases,* Mr. Justice Miller said:

> "And still further, such a construction followed by the reversal of the judgments of the Supreme Court of Louisiana in these cases, would constitute this court a perpetual censor upon all legislation of the States, on the civil rights of their own citizens, with authority to nullify such as it did not approve as consistent with those rights, as they existed at the time of the adoption of this amendment." 16 Wall., at 78.

Mr. Justice Harlan made clear in his dissent in *Levy* the exclusively statutory basis for wrongful-death actions as a matter of legal history, and the same may be even more emphatically said about claims for workmen's

compensation benefits. In spite of the Court's statement of a test, one part of which requires the determination of the extent to which "fundamental personal rights" might be endangered by the Louisiana classification here, we are nowhere told in the opinion just what "fundamental personal right" it is that is involved, to say nothing of whether it is "endangered." The Court says that, while society has long condemned "irresponsible liaisons beyond the bonds of marriage," nonetheless "visiting this condemnation on the head of an infant is illogical and unjust." A fair-minded man might regard it as both, but the Equal Protection Clause of the Fourteenth Amendment requires neither that state enactments be "logical" nor does it require that they be "just" in the common meaning of those terms. It requires only that there be some conceivable set of facts that may justify the classification involved.

In the instant case I cannot condemn as irrational Louisiana's distinction between legitimate and illegitimate children. In a statutory compensation scheme such as this, the State must inevitably draw rather fine and arbitrary lines. For example, Louisiana declares that parents will have priority in this scheme over first cousins, regardless of the degree of dependency or affection in any given case. Surely, no one would condemn this classification as violative of the Fourteenth Amendment, since it is likely to reflect fairly the unarticulated intent of the decedent. Similarly, the State might rationally presume that the decedent would have preferred the compensation to go to his legitimate children, rather than those illegitimates whom he has not acknowledged.

Although the majority argues that "the state interest in minimizing problems of proof is not *significantly* disturbed by our decision," *ante,* at 175 (emphasis added), it clearly recognizes, as it must, that under its decision

additional and sometimes more difficult problems of proof of paternity and dependency may be raised. This is particularly true with respect to petitioner's youngest child, who was not born until after the death of his father. I believe that a State's desire to lessen these problems under its statutory scheme is a rational basis for difference in treatment of the two classes.

Finally, the majority apparently draws some comfort from the fact that the illegitimate children here could not have been acknowledged, since the decedent remained married to another woman while he raised these children. However, I do not believe that it follows from this fact that the statutory classification is irrational. On the contrary, this element of the statutory scheme points up another possible legislative purpose which I do not believe this Court should so freely dismiss. Louisiana, like many other States, has a wide variety of laws designed to encourage legally recognized and responsible family relationships. I believe this particular statutory provision, forbidding acknowledgment of illegitimate children when the parents were not free to marry (in this case because the father was already married to another woman), might be considered part of that statutory pattern designed to discourage formation of illicit family relationships. Whether this is a wise state policy, and whether this particular statute will be particularly effective in advancing it, are not matters for this Court's determination.

*Levy* and today's decision are not only inconsistent with the long line of earlier cases construing the Equal Protection Clause to forbid only irrational classifications; they are quite inconsistent with *Dandridge* v. *Williams, supra,* decided two years after *Levy.* If state welfare legislation involving "the most basic economic needs of impoverished human beings" is to be judged by the traditional "reasonable basis" standard, I am at a

loss to see why that standard should not likewise govern legislation determining eligibility for state workmen's compensation benefits.

All legislation involves classification and line drawing of one kind or another. When this Court expands the traditional "reasonable basis" standard for judgment under the Equal Protection Clause into a search for "legitimate" state interests that the legislation may "promote," and "for fundamental personal rights" that it might "endanger," it is doing nothing less than passing policy judgments upon the acts of every state legislature in the country.