707 P.2d 1051

**INTERMOUNTAIN HEALTH CARE, INC., a nonprofit Utah Corporation doing business as Primary Children's Medical Center, Plaintiff-Appellant,**

v.

**BOARD OF COMMISSIONERS OF BLAINE COUNTY, Idaho, Defendant-Respondent.**

No. 15334.

Supreme Court of Idaho.

Sept. 23, 1985.

Larry Lee Goins, Idaho Falls, for plaintiff-appellant.

Ray Keith Roark, Hailey, for defendant-respondent.

HUNTLEY, Justice.

By this appeal we are asked to determine whether a United States born child of illegal alien parents may be denied coverage for medical care pursuant to the Idaho medical indigency statutes, I.C. §§ 31–3501 et seq.

Karen Regalado was born in Blaine County, Idaho. At birth she had numerous medical problems for which she was first treated at Magic Valley Memorial Hospital in Twin Falls, Idaho, then sent to Primary Children's Medical Center in Salt Lake City, Utah. While hospitalized at Primary, Karen incurred charges of $135,877.54.

Mario and Celia Regalado, Karen's parents, applied to Blaine County for assistance pursuant to the medical indigency statutes. Mario and Celia were illegal

aliens. The Regalados earned approximately $700.00 a month which was supplemented by free housing, utilities and meat supplied by Mario's employer. They had no medical insurance and no property of any value.

The Blaine County Board of Commissioners ("County") denied Regalados' application on the ground that the family was not medically indigent because they could have purchased medical insurance. Intermountain Health Care, Inc., ("IHC") then requested, and was granted, an administrative hearing before the County. Again the Regalados' claim was denied, the basis again being that they were not medically indigent, but also that Mr. and Mrs. Regalado were illegal aliens, could not have maintained legal residence in any Idaho county, and therefore were precluded from receiving medical indigency benefits.

IHC appealed to the district court. The district court upheld the County's denial on the grounds that a U.S. born citizen who has illegal alien parents cannot establish a residence in Idaho, and that Karen was not thereby denied equal protection of the laws.

IHC appeals to this Court contending (1) that Idaho's medical indigency statutes were not intended to excuse counties from obligation for a U.S. born resident who happens to be the child of illegal alien parents; and (2) that Karen, a U.S. citizen, being classified as nonresident because of her parents' illegal alienage, has been denied equal protection of the laws. We reverse.

This case does not in fact present to us the issue of whether illegal aliens are entitled to coverage under medical indigency statutes. The only issue before us is whether Karen Regalado is eligible for benefits. I.C. § 31–3502(1) defines "medically indigent" as: *"[A]ny person* who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services." (Emphasis supplied.)

IHC argues that the words "any person" mean "every person," because those words are in no way qualified. Because Karen Regalado is a "person," she is thereby potentially medically indigent for the purposes of these statutes.

In response the County asserts that the "any person" language in I.C. § 31–3502(1) must be qualified by the language of I.C. § 31–3506.

I.C. § 31–3506 provides:

**31–3506. Determination of obligated county.**—Payment for hospitalization of a medically indigent individual shall be provided by the county in which such individual maintained a residence immediately preceding hospitalization or institutionalization. If such individual has not resided in any county of Idaho for a period of six (6) months within the five (5) years preceding hospitalization, then the county where the individual maintains a residence immediately preceding hospitalization shall be the obligated county. A husband's place of residence shall be deemed the place of residence of his wife and children, unless the husband's residence is out of state, in which case the place of residence of the wife in Idaho shall control. If a man maintains a family residence in one (1) county and maintains another residence in a different county for purposes of employment, the county where the family residence is maintained shall be deemed the man's place of residence.

The County suggests that the legislature intended to limit eligibility to persons who have maintained a "residence" in a county of Idaho at the time of hospitalization. Further, it argues, the place of residence of a child is irrelevant because the statute provides that a husband's place of residence is deemed to be the place of residence of his wife and children. The County contends that a person with no legal right to be in the state, such as an illegal alien, could not possibly maintain "residence."

Because Mario Regalado is an illegal alien and could not maintain residence in Idaho, and because Karen's residence is deemed to be the same as her father's, the County contends that Karen cannot be a resident for purposes of eligibility under the medical indigency statutes.

"Residence" is defined as "personal presence at some place of abode ... and is made up of fact and intention, the fact of abode and intention of remaining...." Black's Law Dictionary 1176 (rev. 5th ed. 1979). It is "the place where one actually lives or has his home; a person's dwelling place or place of habitation; an abode; the house where one's home is; a dwelling house." *Perez v. Health and Social Services*, 91 N.M. 334, 573 P.2d 689, 692 (1977).

■ The medical indigency statutes do not define the words "residence," or "resident," though this Court held in *Cartwright v. Gem County*, 108 Idaho 160, 697 P.2d 1174 (1985) that as used in I.C. § 31-3404, governing application for non-emergency aid to medical indigents, residency "requires physical presence coupled with an intent to remain, or an absence of intent to move elsewhere." 108 Idaho at 161, 697 P.2d at 1175. It has been uniformly held, however, that words denote their ordinary meaning unless a different intent is clearly indicated. Specifically, the word "resident" or the word "residence" as used in a statute pertaining to liability for payment for medical assistance should be given its ordinary and common meaning. *Perez*, 573 P.2d at 691. There is no indication in our statutes that the legislature meant to do otherwise. Further, the words "residence" and "resident" as used in statutes do not have a uniform meaning. "They are to be construed in the light of the context, with consideration of the purpose of the statutory enactment." (Emphasis omitted.) *Catalanotto v. Palazzolo*, 259 N.Y.S.2d 473, 476, 46 Misc.2d 381 (N.Y. 1965). Therefore, the meaning of "resident" in statutes dealing with other matters, such as fishing licenses and college tuition, are not relevant here absent specific evidence of a legislative intent to give them similar meaning.

Karen Regalado was born in Blaine County, Idaho. She is therefore a United States citizen. She is clearly a "person." I.C. § 31-3502(1) provides that where a person in need of hospitalization is a child, the income and resources of that child's parents or guardian will be considered in the determination of that person's indigency. The statute does not state or imply that the parents or guardians stand in the place of the child, or that the child, whether or not he or she has resources, is considered not to exist for the purpose of determining medical indigency.

■ Karen resides with her parents in a dwelling in Blaine County. Karen is therefore clearly a resident of Blaine County. Nothing in the record indicates otherwise. The County's argument that the last two sentences of I.C. § 31-3506 require that a child's residence be deemed the residence of the child's father and that therefore the child cannot be a resident of Idaho because her illegal alien father by definition cannot be a resident is without merit. The last two sentences of that statute apply only to those circumstances where a husband and wife do not reside together. Since Mario, Celia and Karen Regalado reside together in Blaine County the two sentences are inapplicable.

We therefore hold that in her own right, as a resident of Blaine County, Idaho, Karen Regalado is eligible to receive medically indigent benefits if she, together with her parents, are found to be without income or resources sufficient to pay for necessary medical services.

Reversed and remanded for entry of judgment consistent with this opinion.

Costs to appellant. No attorney fees on appeal.

DONALDSON, C.J., and McFADDEN, J., pro tem, concur.

BAKES, J., concurs in the result.

SHEPARD, J., dissents without opinion.

DONALDSON, Chief Justice, specially concurring.

I agree with the analysis of the majority in this case. However, I feel the basic definitional and constitutional arguments raised by the parties and the district court merit further discussion by this Court.

First, under the statute for hospital care for the indigent sick, when we speak of residence, we speak of the residence of the *patient*. Residence of a newly born child is determined by reference to the location of his or her parents or guardians. The status of the parents as illegal aliens does not defeat the fact that they and their children are located in a particular place in the United States, in this case Blaine County, Idaho.

The basic common-law concept of residence, which has often been used interchangeably with domicile, is in fact distinct and more broad than the concept of domicile. Many years ago this Court noted that

"a residence is different from a domicil, although it is a matter of great importance in determining the place of domicil. The essential distinction between residence and the domicil is that the first involves the intent to leave when the purpose for which one has taken up his abode ceases. The other has no such intent; the abiding is *animus manendi*. One may seek a place for the purpose of pleasure, of business or of health. If his intent be to remain, it becomes his domicil; if his intent be to leave as soon as his purpose is accomplished, it is his residence." *Reubelmann v. Reubelmann*, 38 Idaho 159, 164, 220 P. 404, 405 (1923) (*citing* Bouvier's Law Dictionary 2920 (Rawle's rev. 3d ed.)).

The concept of residence, although broad in its pure form, is malleable and capable of being limited in its application by statute—typically by the imposition of a requirement of presence within the state or a county for a specific number of months or years. The Idaho legislature has taken the term "residence" and limited it in many ways to serve the purposes of different statutes. This reveals an implicit belief by the legislature that the concept of residence in its pure form is too broad to serve the specific purposes and promote the specific policies of the various statutes. Since each statutory definition of residency is inexorably linked to the purposes and policies of the statute in which it appears, we cannot rely on the definition in one statute to interpret another, as the county in this case would have us do. The lack of statutory restraints on the definition of residency in the statute on indigent health care at issue must, therefore, be construed as legislative intent that the basic common-law concept of residency is adequate. Absent legislative direction, this Court in *Cartwright v. Gem County*, 108 Idaho 160, 697 P.2d 1174 (1985), necessarily imposed the least restrictive definition of residency as it is used in I.C. § 31–3404. We stated, "Residency, as used in the statute, requires physical presence coupled with an intent to remain, or an absence of intent to move elsewhere." *Id.* at 161, 697 P.2d at 1175. Thus, with respect to this statute, "residency" can be read as virtually synonymous with "domicile."

The county's argument and the district court's opinion are based on the premise that residency, even in its pure form, cannot exist if the person is not a United States citizen, or at least, a legal alien. However, the concepts of residency and domicile do not distinguish between persons who have legally or illegally entered the county. It is possible that the legislature could impose citizenship or legal alienage as a requirement to attain residency in a particular statute. In this case, this could conceivably have been done by amendment to the statute.[1] Even if it

---

1. Such a requirement limiting benefits by restricting the definition of residency would, of course, be subject to constitutional scrutiny. It is helpful to note that the U.S. Supreme Court in *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) found Arizona's one-year durational residency requirement as a condition to receiving nonemergency indigent medical care to be an invidious classification impinging on the right of interstate travel

were, however, the patient in this case *is* a United States citizen and would satisfy that requirement. Every person born in the United States becomes a citizen thereof and needs no naturalization. *United States v. Wong Kim Ark,* 169 U.S. 649, 675, 18 S.Ct. 456, 467, 42 L.Ed. 890 (1898). Karen Regalado's citizenship cannot be divested simply because she resides with and is cared for by non-citizen parents.[2]

In *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the United States Supreme Court held that the right of an illegal alien child to receive a free public education cannot be denied simply because of his illegal status. It is possible, however, that the high Court *would not* extend this equal protection analysis to include indigent medical care, as the county has pointed out. In fact, the Court did make a distinction when it said,

"Public education is not a 'right' granted to individuals by the Constitution. (Citation omitted). But neither is it some governmental 'benefit' indistinguishable from other forms of social welfare legislation. Both the importance of education and maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction." *Id.* at 220–21, 102 S.Ct. at 2396.

On the other hand, the Court seemed particularly concerned with the fact that the classification was of vulnerable and innocent children who were not accountable for their disabling status; but since they were undocumented, they were still subject to possible future deportation. The Court noted that, "Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct

against his children does not comport with fundamental concepts of justice." *Id.* at 220, 102 S.Ct. at 2396. Therefore, this class of illegal alien children can avail itself of equal protection guarantees in areas where their parents cannot; guarantees that children who are not illegal aliens enjoy. The standard of review employed by the Court was an "intermediate" one, allowing the disparate treatment of illegal alien children only if it furthers a "substantial state interest." *Id.* at 230, 102 S.Ct. at 2401. Arguably, denying indigent medical care to these children would not be justified under this standard anymore than denying them an education. *See, e.g., Darces v. Woods,* 35 Cal.3d 871, 201 Cal.Rptr. 807, 679 P.2d 458 (1984) (excluding undocumented siblings from the definition of essential persons for AFDC purposes violated state's constitutional guarantee of equal protection). In fact, Justice Powell, in his concurring opinion in *Plyler,* found the court's reasoning may be applicable in the welfare context and noted that "If the resident children of illegal aliens were denied welfare assistance, made available by government to all other children who qualify, this also—in my opinion—would be an impermissible penalizing of children because of their parents' status." *Plyler, supra,* 457 U.S. at 239, n. 3, 102 S.Ct. at 2406, n. 3 (Powell, J., concurring).

Even if we were to accept the county's interpretation that the *Plyler* analysis could not be extended to indigent medical care, that argument would be relevant only to the care provided to illegal aliens, such as Mr. and Mrs. Regalado themselves. Here, the care is being provided to a United States citizen. The statute allows us to look to the parents only as a reference in

---

and therefore unconstitutional. *See also, Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1981), where the U.S. Supreme Court applied the Supremacy Clause to bar Maryland from denying aliens the ability to establish in-state status for purposes of tuition at state universities.

**2.** It is somewhat shocking that in its brief, the county begins its argument with a question, "What then does it gain us to consider Karen

Regaldo's citizenship in this litigation?" Then answers by saying, "Absolutely nothing." Upon this faulty assertion the county proceeds to argue as if Karen and her parents were legally indistinguishable. For an exhaustive discussion of how the Fourteenth Amendment to the United States Constitution did not change the fundamental principle of citizenship by birth, *see United States v. Wong Kim Ark,* 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898).

answering two questions: (1) what is the residence of the child? and (2) does the child qualify for indigency status? The statute cannot—and under no reasonable interpretation does it—transform a United States citizen into an illegal alien simply by this process of referencing to the parents.

Indeed, the parents benefit from being relieved of the obligation to pay for the hospitalization of their child, but no one will dispute that the child is the *primary* beneficiary of the life-saving medical care paid for under I.C. § 31–3501 *et seq.* A recent federal district court decision noted that "The mere fact that the parent's circumstances determine eligibility [for Aid For Dependent Children] does not by itself mean that the parent is the primary beneficiary." *Ruiz v. Blum,* 549 F.Supp. 871, 876 (S.D.N.Y.1982); *see also King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

The court in *Ruiz* also noted that if "a native born citizen who is otherwise eligible is denied, on the grounds of his mother's [undocumented] status, day care services which are granted to all other eligible native born children, ... it clearly penalizes him solely by reason of his mother's status." *Ruiz, supra,* at 877. The classification the county would have us accept would be based solely on the status of the parents of a U.S. citizen. The United States Supreme Court has ruled that classifications based on alienage of a person, let alone alienage of a person's parents, are "inherently suspect and subject to close judicial scrutiny." *Nyquist v. Mauclet,* 432 U.S. 1, 7, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63 (1977); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971).

"In undertaking this scrutiny, 'the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn.' *Examining Board v. Flores de Otero,* 426 U.S. [572] at 605, 96 S.Ct. [2264] at 2283 [49 L.Ed.2d 65 (1976)]. *See In re Griffths,* 413 U.S. [717] at 721–722, 93 S.Ct. [2851] at 2854–2855 [37 L.Ed.2d 910 (1973)]. Alienage classifications by a State that do not withstand this stringent examination cannot stand." *Nyquist, supra* at 7, 97 S.Ct. at 2124.

A review of the record and arguments of this case reveals no substantial or compelling justification for the state[3] to treat Karen Regalado differently from other U.S. citizen children based on the alienage of her parents. Thus, under either the intermediate test of scrutiny of *Plyler,* or the strict test of scrutiny under *Nyquist,* such a classification would be unconstitutional. I share the concern of Justice Powell when he noted in *Plyler* that "visiting ... condemnation on the head of an infant for misdeeds of the parents is illogical, unjust and contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrong doing." *Plyler, supra,* 457 U.S. at 238, 102 S.Ct. at 2406 (Powell, J., concurring); *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

In summary, therefore, with the proper light cast on the definition of residency and the equal protection guarantees implicated by this decision, I concur with the majority in reversing the holding of the district court.

**3.** The Court in *Nyquist* distinguished actions that states could take in classifying aliens from actions that Congress could take, noting "Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States." *Id.* at 7, n. 8, 97 S.Ct. at 2124, n. 8; *Mathews v. Diaz,* 426 U.S. 67, 84–87, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).