# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**March 17, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

STATE OF TENNESSEE, ex rel.,    )
DONNA RANDOLPH,               )
                                )   Putnam Juvenile
     Plaintiff/Appellant,    )   No. 83
                                )
VS.                        )   Appeal No.
                                )   01A01-9808-JV-00419
JOHN R. POTEET,          )
                                )
     Defendant/Appellee.    )

## CONCURRING OPINION

I concur with the court's opinion because it applies the current child support guidelines as interpreted by the Tennessee Supreme Court. An obligor parent's responsibility to children of a later marriage does not provide a basis for deviating from the guidelines unless the "extraordinary needs" of these children subject the parent to an "extreme economic hardship." *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996). Mr. Poteet has not presented evidence that satisfies this demanding standard because supporting former children does not, in and of itself, cause an extreme economic hardship.

While this evidentiary finding concludes Mr. Poteet's claims in this case, it is not the final word on a more fundamental issue Mr. Poteet has not raised. That issue is the constitutionality of the "first families first" policy implicit in Tennessee's guidelines that classifies children not on the basis of their need but on the timing of their birth. While this policy may simplify the application of the child support guidelines, it patently ignores reality. As a result, it appears to unreasonably affect the fundamental rights not only of subsequent children but also their parents.

Appellate courts generally decline, as a prudential matter, to address issues that have not been raised below. *See Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Harrison v. Schrader*, 569 S.W.2d 822, 828 (Tenn. 1978). Our refusal to consider matters not raised extends to issues involving the constitutionality of a statute. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.

1983); *City of Elizabethton v. Carter County*, 204 Tenn. 452, 462, 321 S.W.2d 822, 827 (1958). Because Mr. Poteet has not challenged the constitutionality of the child support guidelines, this issue is not ripe for adjudication in this case.[1] However, this court should not hesitate to take up the issue when it has been properly raised in another case.

# I.

Donna Lynn Underwood was an unemancipated child when she gave birth to Stephen Ashley Underwood in April 1982. Shortly after the child's birth, Ms. Underwood's parents, acting on her behalf, filed a paternity action against John Poteet in the Putnam County Juvenile Court. Mr. Poteet, who was sixteen at the time, neither admitted nor denied that he was the child's father and insisted on a blood test to ascertain the child's parentage. Ms. Underwood's parents apparently never pursued the paternity action, and Ms. Underwood later married and became Donna L. Randolph. Her second child was born in October 1984, and her third in January 1988. Mr. Poteet also married, and he and his wife eventually had three children.[2]

In May 1990, the State filed a second paternity action against Mr. Poteet in the Putnam County Juvenile Court. For the second time, he neither admitted nor denied paternity and demanded a blood test. After the test established that he was Stephen Underwood's father, Mr. Poteet agreed to pay $200 per month to support his son. In February 1991, the juvenile court entered an order finding that Mr. Poteet was the child's father, directing Mr. Poteet to pay $200 per month as child support, and changing Stephen's surname from Underwood to Poteet. Ms. Randolph retained custody of the child.

In November 1997, the State filed a petition on Ms. Randolph's behalf requesting an increase in Mr. Poteet's child support obligation to Stephen. The

---

[1]Mr. Poteet did not raise the issue of the constitutionality of the guidelines in his pleading filed in the juvenile court and did not notify the Attorney General and Reporter that the constitutionality of the guidelines was at issue as required by Tenn. R. Civ. P. 24.04.

[2]The record does not contain specific information concerning the circumstances surrounding Mr. Poteet's marriage or the birth of his children because neither of the parties elected to provide a verbatim transcript or statement of the evidence covering the first day of the trial when they testified in juvenile court. However, the juvenile court's memorandum opinion indicates that Mr. Poteet was married and that he and his wife had one child before the State filed its paternity action against Mr. Poteet in May 1990.

petition alleged that there was a significant variance between Stephen's current child support and the amount of child support he would be receiving under the guidelines based on Mr. Poteet's current salary. While Mr. Poteet admitted that his income had increased since 1991, he asserted that he was his wife now had three children between the ages of seven and one and that they were "struggling to meet their financial needs." Accordingly, he requested the juvenile court either to deny the requested modification or to grant "significant deviation from the guidelines in view of the need to support his three children who live with him and his wife."

Following a hearing, the juvenile court determined that the guidelines required Mr. Poteet to pay $469 per month to support Stephen. However, the juvenile court also determined that applying the guidelines would be "unjust or inappropriate" because one of Mr. Poteet's children was born before the entry of the February 1991 support order and because the strict application of the guidelines would work an extreme financial hardship on Mr. Poteet's current family. Accordingly, the trial court increased Mr. Poteet's child support obligation to Stephen from $200 to $325 per month. The State has appealed this decision.

## II.

Tennessee's child support guidelines were first promulgated in 1988 to decrease the number of impoverished children living in single-parent families, to make child support awards more equitable by ensuring more consistent treatment of persons in similar circumstances, and to minimize the economic impact of divorce on children. *See* Tenn. Comp. R. & Regs. r. 1240-2-4-.02(2)(a), (b), (e) (1994). Like their counterparts in other states, these guidelines have had a salutary effect on children in Tennessee whose lives are affected by their parents' divorce. Thus, by any objective measure, the promise of the guidelines has, in part, been fulfilled.

Experience over the last twelve years has, however, highlighted several potentially significant flaws in the design of the guidelines. In an effort to develop guidelines that would be simple to apply, the author of Tennessee's original guidelines chose what is known as the "percent-of-obligor-income" model.[3] While

---

[3] *See Final Report, Evaluation of Child Support Guidelines, Vol I: Findings and Conclusions* (continued...)

this model is simple to use,[4] it is not the model currently being used by most states. Over thirty states currently employ the "income-shares" model which computes child support obligations based on the income of both parents rather than just the income of the non-custodial obligor parent.[5] The "income-shares" model is considered preferable to the "percent-of-obligor-income" model for three reasons: (1) guidelines based on the income of both parents are perceived as being more fair than guidelines based only on the obligor's income; (2) states prefer guidelines based on a credible body of economic research concerning child-rearing expenditures; and (3) states perceive that the "income-shares" model is more equitable because it considers a broader range of variables.[6]

To keep the "percent-of-obligor-income" model simple, it was designed based on the assumption that the calculation of child support involved only one set of children – the child or children of the litigating parties. This assumption overlooks two facts of life in contemporary society. First, a significant percentage of all marriages end in divorce. Second, an estimated seventy-five percent of these divorced persons will remarry,[7] and many of these persons have had or expect to have either new biological children, step-children, or both.[8] Cases involving multiple families or serial family development are now the norm rather than the exception.[9]

The original guidelines based on the "percent-of-obligor-income" model did not effectively address the complexities of multiple relationships, remarriage, and

---

[3](...continued)
¶ 1.2.1 (United States Dep't of Health & Human Servs., Admin. for Children & Families, Office of Child Support Enforcement 1996) ("Final Report"); Robert G. Williams, *An Overview of Child Support Guidelines in the United States* 5, *in* Child Support Guidelines: The Next Generation (Margaret C. Haynes, ed. 1994) ("Williams").

[4]*See* Williams, *supra* note 3, at 7.

[5]*See* Final Report, *supra* note 3, at ¶ 1.2.2; Williams, *supra* note 3, at 5-6.

[6]*See* Williams, *supra* note 3, at 7.

[7]Eighty percent of divorced men and fifty-five percent of divorced women remarry within ten years after their divorce. *See* Final Report, *supra* note 3, ¶ 3.2.

[8]*See* Thomas Espenshade, *Marriage Trends in America: Estimates, Implications, and Underlying Causes*, 11 Population and Dev. R. 193 (1985).

[9]*See* Marianne Takas, *Addressing Subsequent Families in Child Support Guidelines* 37, *in* Child Support Guidelines: The Next Generation (Margaret C. Haynes, ed. 1994) ("Takas").

blended relationships. Thus, by design, guidelines like the ones currently in effect in Tennessee embody what experts in the field refer to as the "first families first" bias. They disregard the needs of the obligor parent's other children in computing child support obligations for the children directly involved in the litigation. The theoretical basis for disregarding the subsequent children is that their support is nothing more than a voluntarily assumed obligation of their parent. Like other voluntarily assumed obligations, these support obligations cannot be considered as "changed circumstances" warranting a reduction in child support payments otherwise owed. *See Dillow v. Dillow*, 575 S.W.2d 289, 291 (Tenn. Ct. App. 1978).

This "first families first" bias implicit in Tennessee's guidelines has not escaped the notice of Tennessee's courts. One trial court attempted to address the matter by calculating an obligor parent's child support obligation to the two children of his previous marriage by calculating the total amount of the parent's support obligation for all five of his adopted and biological children and then by awarding his former spouse two-fifths of this amount. A panel of this court reversed because the record did not contain sufficient evidence to make out a case for deviating from the guidelines. However, the panel also held that "the courts may consider a parent's obligation to the natural or adopted children of his or her immediate family if such evidence is presented to rebut the presumption that the amount provided by the Guidelines is the appropriate child support award." *Wilson v. Wilson*, No. 01A01-9007-CH-00244, 1991 WL 83352, at * 4 (Tenn. Ct. App. May 22, 1991) *perm. app. denied* (Tenn. Sept. 30, 1991).

Another panel of this court revisited this issue two years later in a case involving the obligation of a married man to support a non-marital child in addition to his two marital children. The trial court calculated the support obligation based on the father's net income without considering the fact that he was also supporting two other children. Rather than following the deviation from the guidelines approach approved in *Wilson v. Wilson*, two members of the panel held that the father should have been permitted to deduct from his gross income that amount of support the guidelines would have required had he been ordered to support the two children of his marriage. *See Adams v. Reed*, 874 S.W.2d 61, 63-65 (Tenn. Ct. App. 1993). The third member of the panel arrived at the same result using the same deviation rationale that had been used in *Wilson v. Wilson.*

The adoption of a "second families first" policy in *Adams v. Reed* prompted a response from the Tennessee Department of Human Services, the author of Tennessee's guidelines. Rather than following the lead of a majority of states that had added provisions to their guidelines permitting adjustments or deviations for additional dependents,[10] the Department revised the guidelines to provide that

> Children of the obligor who are not included in a decree of child support shall not be considered for the purposes of reducing the obligor's net income or in calculating the guideline amount. In addition, these children should not be considered by the court as a reason for deviation unless they meet the requirements of Rule 1240-2-4-.04(4).

Tenn. Comp. R. & Regs. r. 1240-2-4-.03(4) (1994). The revised guidelines permitted revisions only in circumstances of "extreme economic hardship" brought about by "extraordinary medical needs not covered by insurance or other extraordinary special needs" of "child(ren) living in the home with the obligor for whom the obligor is legally responsible." Tenn. Comp. R. & Regs. r. 1240-2-4-.04(4) (1994). The Tennessee Supreme Court has construed these regulations as significantly limiting the courts' discretion to deviate from the guidelines. *See Jones v. Jones*, 930 S.W.2d at 544-45.

### III.

Children have a right to a standard of living, care, and maintenance commensurate with the collective incomes and best efforts of both their parents. *See* Tenn. Code Ann. § 34-11-102(a) (1996); *Hall v. Jordan*, 190 Tenn. 1, 11, 227 S.W.2d 35, 39 (1950); *Evans v. Evans*, 125 Tenn. 112, 119, 140 S.W. 745, 747 (1911). Their right to expect that their parents will adequately feed, clothe, house, and educate them does not depend on the date of their birth or the family into which they are born. *See Martinez v. Martinez*, 660 A.2d 13, 17 (N.J. Super. Ct. Ch. Div. 1995). Thus, the right to support exists regardless of the parents' marital status, and the parents' shared obligation to their children does not end when they divorce.

---

[10]A recent study prepared for the South Carolina Department of Social Services points out that thirty-five states currently permit adjustments or deviations for an obligor parent's additional dependents. *See* Robert G. Williams, et al., *Economic Basis for Updated Child Support Schedule* 60-61 (Policy Studies, Inc. 1997).

The real parties in interest in any proceeding to determine the existence or amount of a child support obligation are not the parents but rather the children whose support is at issue. *See Thompson v. Thames*, 67 Cal. Rptr. 2d 695, 705-06 (Ct. App. 1997); *Nowak v. Trezevant*, 685 A.2d 753, 757 (D. C. 1996); *Department of Health & Rehabilitative Servs. v. Holland*, 602 So. 2d 652, 654 (Fla. Dist. Ct. App. 1992); *McDonald v. Bellotti*, 562 N.E.2d 114, 117 (Mass. App. Ct. 1990); *Rodden v. Rodden*, 527 S.W.2d 41, 43 (Mo. Ct. App. 1975). Therefore, a modification action under the guidelines is, in effect, derivatively brought on the child's or children's behalf.[11] Recognizing that support proceedings should be driven by the needs of the child rather than those of the parents illustrates the inherent unfairness of the principle that a child's right to support should somehow be influenced by the conduct of its parents. This notion penalizes innocent children for conduct of their parents, and in other contexts has been found to be constitutionally suspect. *See Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175, 92 S. Ct. 1400, 1406 (1972) (invalidating a classification based on the marital status of the child's parents).

There has been surprising little judicial consideration of the constitutional legitimacy of the "first families first" bias inherent in child support guidelines like the ones currently in effect in Tennessee. Only one court, in a very cursory fashion, has held that the guidelines can withstand rational basis equal protection scrutiny. *See Feltman v. Feltman*, 434 N.W.2d 590, 592 (S.D. 1989). However, this holding prompted a dissenting justice to observe that the classification between children of a former marriage and children of a current marriage is "unconstitutional because it discriminates against children of a 'noncustodial' parent's second family, denying them equal protection under the law. This statute classifies children by accident of their birth, a classification that has no rational relationship to any legitimate governmental interest." *Feltman v. Feltman*, 434 N.W.2d at 593-94 (Henderson, J., dissenting). Others have raised similar concerns, not only about the reasonableness of the "first families first" bias but also about its effects on other fundamental rights and interests of the noncustodial parent and his or her spouse. *See* Rebecca B. Garland, *Second Children Second Best? Equal Protection for Successive Families Under State Child Support Guidelines*, 18 Hastings Const. L.Q. 881 (1991).

---

[11] Formerly, actions to require a noncustodial parent to support a child were required to be brought in the child's name. *See Brooks v. Brooks*, 166 Tenn. 255, 258, 61 S.W.2d 654, 655 (1933).

This issue involves a child's right to receive support from a common biological parent. All children of the same parent have the right to share fairly with their siblings in their common parent's resources. When other states have adopted child support guidelines that accommodate this right, the Department cannot place administrative convenience ahead of fundamental fairness. The Department cannot simply shrug its bureaucratic shoulders and announce that it has done the best it can.

Tennessee's child support guidelines contain the standards by which they should be measured. Their stated purpose is "to make child support awards more equitable by ensuring more consistent treatment of persons in similar circumstances." Tenn. Comp. R. & Regs. r. 1240-2-4-.02(2)(b). It should be apparent that the circumstances of children with a common biological parent are similar. Accordingly, when this issue is properly raised in a future case, the courts should put the guidelines' "first families first" bias to the test and should carefully consider whether it passes muster under the state and federal constitutions.

_____
WILLIAM C. KOCH, JR., JUDGE