522 So.2d 137 (1988)
Lillie P. WINN, Individually and as Provisional Tutrix for Leroy Winn and Tawanna Denise Winn, Plaintiffs-Appellees,
v.
THOMPSON-HAYWARD CHEMICAL COMPANY, Defendant-Appellant.
No. 19697-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1988.
*139 Lunn, Irion, Johnson, Salley & Carlisle, for defendant-appellant.
Sam N. Gregorio by Jim McDougle, for plaintiffs-appellees.
Before MARVIN, JASPER E. JONES and NORRIS, JJ.
MARVIN, Judge.
In this worker's compensation action, the employer appeals a judgment awarding death benefits to the concubine and informally acknowledged illegitimate minor children of its employee who died from a stroke while at work.
Claimants answer the appeal and seek statutory penalties and attorney fees.
In all respects, we affirm.
The employer contends the fatal stroke was not causally work-related and that claimants were not "dependent" on the decedent. Alternatively, the employer contends that the benefits which might be owed the illegitimates should derive from their being classified as "other dependents" rather than "children" under the statutory definitions.

FACTS
The 42-year-old decedent, Leroy Rochelle, Jr., worked, without a helper, as a truck driver and delivery-man for several years before his stroke on September 19, 1985. He suffered from high blood pressure or hypertension for more than three years and was off work for about two weeks in 1982 because of the hypertension. His condition was known to his employer. He averaged working almost 45 hours per week during 1985.
Between 7:00 a.m. and 1:30 p.m. on September 19, 1985, the decedent made deliveries to 11 customers of about 17,000 pounds of his employer's products that were contained in bags, boxes, and drums. Many of the individual orders delivered totalled several hundred pounds. One customer's order totalled 7,000 pounds. Some smaller orders were unloaded and delivered manually by decedent. On other orders decedent used the hydraulic lift gate of his truck and a two-wheeled dolly to unload and deliver. Decedent drove a truck with power steering and standard transmission, the air conditioning system in which was not working on the fatal day. Temperature reached 90° F. that afternoon.
Between 1:30 and 3:00 p.m., at the employer's warehouse, decedent ate lunch and waited for his truck to be loaded with orders scheduled for afternoon delivery. These orders totalled more than 1,200 pounds. To his first customer, the decedent delivered nine 100-pound bags of detergent. The customer noted that decedent took longer than usual to complete the delivery and did not complain about any physical condition.
At decedent's ultimately fatal stop that afternoon, the customer noticed that decedent did not control the truck as he usually did and that he "jerked" the truck when stopping it. Departing the truck, decedent supported himself on the door, complaining of feeling dizzy, stating that he had been "feeling bad" since his last delivery. The customer called an ambulance for decedent who thereafter sat or laid on the ground and was unable to respond to questions by the customer who unloaded his own order.
Decedent was unconscious when he arrived at the hospital where he was diagnosed as suffering a massive stroke. Without regaining consciousness, he died two days later.

MEDICAL EVIDENCE
Decedent suffered a hemorrhagic stroke from the rupture of a blood vessel in his brain. The hemorrhage increased the pressure on his brain tissue and caused first the dizziness and then loss of consciousness.
*140 A CT scan showed that the rupture occurred in one of the small blood vessels which are commonly weakened in persons with chronic hypertension.
The internist, who examined decedent in the emergency room, and a cardiologist, who reviewed the medical records, opined that activities such as driving and lifting heavy objects tend to increase blood pressure. The cardiologist explained that gripping and turning a steering wheel causes tension and increases blood pressure more than many occupational activities, even though driving requires less muscular exertion.
The cardiologist opined that there was a reasonable probability that decedent's work activities in some degree contributed to an increase in blood pressure which ultimately caused the stroke. Because of decedent's hypertension, one of his smaller and weakened blood vessels was destined to rupture, whether decedent was at work or at home, according to the internist. The internist agreed that decedent's work activities would raise his blood pressure and that decedent's work on the day of the stroke could have been the "last straw" that caused the blood vessel to rupture.
Both doctors agreed that decedent's exertion at work, driving, unloading and delivering, was greater than the exertion of someone not at work.

CAUSAL LINK BETWEEN WORK AND STROKE
An employee's accidental injury is compensable under the worker's compensation law if it arises out of and in the course of his employment. LRS 23:1031. Decedent's stroke clearly occurred in the course of his employment. The critical issue is whether the stroke "arose out of" his employment.
The law is set forth in Reid v. Gamb, Inc., 509 So.2d 995 (La.1987):
[I]t is well settled that the occurrence of a cerebral vascular accident, or stroke, is a "personal injury by accident" within the ambit of La.R.S. 23:1031. * * *
[I]t is not necessary for the claimant to prove that the work was the sole cause of the ... injury, so long as it is shown to be a contributing, accelerating or aggravating factor. The presence of a history of arteriosclerosis or even the fact that a heart attack was "inevitable" does not necessarily rule out an award. * * *
[I]f the physical exertion, stress or strain on the job, and preceding the [stroke], is no more than the worker would likely have experienced in a non-work situation, the [stroke] may be a result of the natural progression of a preexisting disease rather than the result of the employment activity. In order to avoid unfairly charging the employer with the cost of strokes not causally related in some way with the employment, if the employee has a preexisting weakness or condition that predisposes him to a cerebral vascular accident, the claimant should be required to prove that the [exertion, stress or strain of the] employment acting on the preexisting condition was [of] a degree greater than that generated in everyday non-employment life.

509 So.2d at 996-998; citations omitted. Emphasis and bracketed material supplied.
Reid was rendered on the day the trial court issued written reasons for judgment. The trial court correctly relied on Guidry v. Sline Indus. Painters, Inc., 418 So.2d 626 (La.1982), a heart attack case. Reid follows Guidry and provides methodology by which the causation issue in stroke cases should be analyzed and resolved. See also, Juge, Cardiovascular Claims in Workers' Compensation: The Evolving Law, 32 Loy.L.R. 895 (1987).
The trial court found that decedent's stroke arose out of his employment because his work activities on the day of the stroke "created a considerably greater degree of stress and strain than that which he would have experienced, had he been in an everyday, non-employment situation." This factual finding is amply supported by the law and the evidence. The internist's opinion that a stroke was inevitable does *141 not avail the employer. Reid, quoted supra.

ROCHELLE'S FAMILY
Decedent and Lillie Winn lived together from 1968 until decedent's death. Although they were not married, they maintained and projected to others a husband-wife relationship. They had two children, a son, born in 1969, and a daughter, born in 1973. No name was shown as the father on the birth certificate of either child, but decedent informally acknowledged them as his children in his words and actions. He told friends and relatives they were his children. He actively participated in raising them, financially and otherwise. There is no evidence indicating that decedent had other children. Ms. Winn had two adult children and a grandchild who lived in the household. The claim for death benefits is made only by Ms. Winn and the two children decedent acknowledged as his.

ILLEGITIMATES AS "CHILDREN"?
The employer contends the trial court erred in classifying the two illegitimates under the worker's compensation law in the same classification that is provided for legitimate or formally acknowledged illegitimate children.
LRS 23:1021(3) defines "children" as "only legitimate children, step-children, posthumous children, adopted children, and illegitimate children acknowledged under the provisions of Civil Code Articles 203 and 205." Our emphasis. C.C. Articles 203 and 205 contemplate only formal acknowledgment, either by notarial act or in the registry of the child's birth or baptism.
"Children" are conclusively presumed to be wholly and actually dependent on the deceased employee. The age and residency requirements of LRS 23:1251 for "children" are satisfied and are not at issue here. A claimant not within the definition of "child" may claim death benefits as an "other dependent" upon proving dependency under § 1252. The calculation of benefits under § 1232 is more favorable for "children" than it is for "other dependents."
Before 1972, informally acknowledged illegitimate children recovered death benefits only as "other dependents" and not as "children" of the deceased employee, even where the decedent did not leave other legitimate or formally acknowledged illegitimate children. See Thompson v. Vestal Lumber & Mfg. Co., 208 La. 83, 22 So.2d 842 (1945), and Williams v. Jahncke Service, 55 So.2d 668 (Orl.App.1951).
In Stokes v. Aetna Casualty and Surety Company, 257 La. 424, 242 So.2d 567 (1970), the decedent's household included his four legitimate children and his two unacknowledged illegitimate children. The maximum death benefits were exhausted by the legitimate children, leaving nothing for the illegitimate children. No unconstitutional discrimination in the statutory scheme was found. The court reasoned that the statute did not deny unacknowledged illegitimates a right to benefits, but simply relegated them with other dependent relatives such as parents, to a less favorable position in the statutory scheme. 242 So.2d at 570.
The Supreme Court granted certiorari and reversed that ruling under Constitutional restraints, in Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972):
So far as this record shows, the dependency and natural affinity of the unacknowledged illegitimate children for their father were as great as those of the four legitimate children whom Louisiana law has allowed to recover. The legitimate children and the illegitimate children all lived in the home of the deceased and were equally dependent upon him for maintenance and support. It is inappropriate, therefore, for the court below to talk of relegating the unacknowledged illegitimates "to a less favorable position as are other dependent relatives such as parents." The unacknowledged illegitimates are not a parent or some "other dependent relative"; in this case they are dependent children, and as such are entitled to rights granted other dependent children. * * *
*142 It may perhaps be said that statutory distinctions between the legitimate and illegitimate reflect closer family relationships in that the illegitimate is more often not under care in the home of the father nor even supported by him. The illegitimate, so this argument runs, may thus be made less eligible for the statutory recoveries and inheritances reserved for those more likely to be within the ambit of familial care and affection. Whatever the merits elsewhere of this contention, it is not compelling in a statutory compensation scheme where dependency on the deceased is a prerequisite to anyone's recovery, and where the acknowledgment so necessary to equal recovery rights may be unlikely to occur or legally impossible to effectuate even where the illegitimate child may be nourished and loved.
92 S.Ct. at 1403-4, 1405-6. (Footnote omitted).
When Weber was decided, C.C. Art. 204 prohibited the acknowledgment of a child if the parents were incapable of contracting marriage at the time of the child's conception but allowed acknowledgment if the parents later married. The definition of "children" in LRS 23:1021(3) then included children "acknowledged under the provisions of Civil Code Articles 203, 204, and 205."
Article 204 was repealed by Act 607 of 1979. The reference to Art. 204 in § 1021(3) was removed by Act One of 1983, 1st Ex.Sess. The current definition in § 1021, which includes children formally acknowledged under the provisions of C.C. Arts. 203 and 205, continues the pre-Weber classifications and does not mention informally acknowledged illegitimate children.
Act One of 1983, 1st Ex. Session, substantially revised the worker's compensation law but did not change the definition of children other than to delete the repealed civil code article number (204). This cosmetic change does not purport to alter the statutory classification condemned by Weber that informally acknowledged illegitimate children are less favorably benefited than legitimate or formally acknowledged illegitimate children. The legislature's oversight notwithstanding, we are mandated by the federal [and 1975 state] constitution to interpret § 1021 to include informally acknowledged illegitimates in the same classification as formally acknowledged illegitimates and legitimates.
Decedent's words and conduct compel the conclusion that the two children were informally acknowledged as his. They lived in the same household with decedent from the time they were born until his death, when they were 16 and 12 years of age. He spoke of them as his children and treated them as such. Their natural affinity for their father and their deprivation of support from their father's work-related death cannot be regarded as any different from that which legitimate children, of a marriage or by formal acknowledgment, experience in similar circumstances. The fact that decedent had no legitimate or formally acknowledged children to "compete" with these claimants for benefits does not make Weber inapplicable or mandate reversal.
The Weber decedent was married to someone other than the mother of his illegitimate children. C.C. Art. 204 then made it legally impossible to legitimate those children by formal or informal acknowledgment. There is no evidence that our decedent, Rochelle, was prevented from formally acknowledging the two children, either before or after the repeal of Art. 204 in 1979. The fact that he did not formally acknowledge them does not allow us to circumvent Weber.
Weber condemned the C.C. Art. 204 legal bar to acknowledgment as one of the many burdens that Louisiana law placed on illegitimate claimants. See text accompanying FN. 9, 92 S.Ct. at 1404. The Supreme Court recognized that acknowledgment was unlikely or legally impossible of occurring. P. 1406, quoted supra.
The trial court properly classified these claimants as "children" under Weber and properly applied the statutory presumption that they were actually and wholly dependent on Rochelle's earnings for support at *143 the time of his accidental injury and death. LRS 23:1231, 1232, 1251. Because § 1251 makes the presumption conclusive, we need not consider the employer's argument that the children's dependency was rebutted by the evidence.

CLASSIFICATION OF CONCUBINE; PROOF OF DEPENDENCY
Ms. Winn's status as a concubine stems from her openly and permanently living with Rochelle as husband and wife. Without benefit of marriage, she is relegated to the status of an "other dependent." Henderson v. Travelers Ins. Co., 354 So.2d 1031 (La.1978). As such, she is not favored with the presumption of dependency afforded a surviving spouse under § 1251. Unlike the informally acknowledged illegitimates, she must prove her dependency. § 1252.
The trial court found she was actually and wholly dependent on Rochelle's earnings for support. This finding is supported by the record and is not clearly wrong.
Rochelle's household included Ms. Winn and her four children and Ms. Winn's grandchild by one of her older children. The mother of the grandchild contributed $50 per month toward household expenses. Ms. Winn was unemployed and received $240 per month from Aid to Families with Dependent Children. When she applied for this assistance, Ms. Winn lied to AFDC, representing that Rochelle was not living in the home and was contributing only $10 per week to the support of his two children! Ms. Winn admitted her lie at trial, explaining she needed additional financial help.
Rochelle's net monthly income of $800 was about 73 percent of the household's total monthly income of $1,090. In addition to fixed monthly expenses of about $725 for rent, utilities, food, and installment payments for furniture, there were expenses in varying amounts for gasoline for Rochelle's car and for the cost of educating and clothing his two school-age children.
Ms. Winn testified that the amount of money Rochelle gave her to run the household varied from $50 to $200 per week. On this statement, the employer argues that Rochelle did not use all of his take-home pay to support her and the children. Ms. Winn testified, however, that when Rochelle gave her less than his entire paycheck of $200, he paid some of the household expenses directly out of the money he retained. She also testified that Rochelle gave her money at other times and when she did not ask him for it. The record does not substantiate the bald inference that Rochelle spent significant portions of his earnings on things other than the support of his family.
A showing of actual dependency does not require proof that the claimants, without decedent's contributions, would have lacked the necessities of life, but requires only the showing that claimants relied on decedent's contributions to maintain their accustomed mode of living. Hurks v. Bossier, 367 So.2d 309 (La.1979).
Details of the household income and expenses substantiate Ms. Winn's testimony that she relied on Rochelle's income to maintain the accustomed standard of living of herself and two children. The trial court correctly found that Ms. Winn was actually dependent on Rochelle.
We also find that the trial court was not clearly wrong in concluding that Ms. Winn was totally, rather than partially, dependent on Rochelle's earnings. The $50 per month contributed by Ms. Winn's daughter obviously did little to defray the expenses of the daughter and the grandchild, and did not otherwise benefit Ms. Winn.
The AFDC case worker testified that Ms. Winn was allocated $58 of the $240 monthly payment with the balance being allocated to Rochelle's two children and to Ms. Winn's grandchild. Notwithstanding the AFDC designated allocation, Ms. Winn's testimony explains that the AFDC money was sought and used to help support her two older children because the father of the older children was not supporting them.
We do not condone Ms. Winn's misrepresentations to AFDC to obtain additional *144 money for the household, but we cannot consider the $58 monthly allocation to her to be a substantial source of income for her own support. The record supports the trial court's finding that Ms. Winn was totally dependent on Rochelle's earnings for her own support. Compare Moore v. Millers Mut. Fire Ins. Co. of Texas, 406 So.2d 708 (La.App.2d Cir.1981), writ denied. There, decedent's mother was found to be partially dependent on decedent's earnings because she also received substantial contributions toward her support from other members of the household.

MS. WINN'S BENEFITS
The trial court awarded Ms. Winn weekly benefits equivalent to 18¾ percent of Rochelle's average weekly wages. This percentage is the difference between the 46¾ percent payable to the two Rochelle children and the 65 percent statutory maximum provided in LRS 23:1232. The employer contends Ms. Winn's benefits should not exceed 12 percent of his average wage since her pro-rata share of expenses in a seven-person household is only about 12 percent. The calculation of benefits under § 1232 does not depend on the number of the persons in the household, but on the number, status and extent of dependency of the persons in the category of compensation claimants. Rochelle's two children are legally entitled to 46¼ percent of his average weekly wages. Ms. Winn is the only "other dependent." Had she been the sole claimant, Ms. Winn would have been entitled to 32½ percent of his average weekly wages. Because the children's priority claims were recognized, Ms. Winn was correctly awarded the difference between their share of the benefits and the statutory maximum of 65 percent.

PENALTIES AND ATTORNEY FEES
The trial court denied the claimants' demand for statutory penalties and attorney fees, finding that the legal and factual issues were "close" and that the employer was not arbitrary and capricious in failing to pay benefits. The claimants challenge these findings in answer to the appeal. We affirm the trial court's result without reaching the factual issue whether the employer's denial of benefits was arbitrary and capricious.
The "arbitrary and capricious" standard continues to apply to attorney fee awards under LRS 23:1201.2 after the 1983 revision of the law, but does not apply to the penalty under § 1201. Assessment of penalties after 1983 is determined by inquiring whether the employer or its insurer has "reasonably controverted" the compensation claims. Penalties, when assessed, are assessed "against either the employer or the insurer, depending upon who was at fault in causing the delay."
We assume, for discussion purposes and without deciding, that there was no reasonable controversy as to the claimants' entitlement to death benefits.
Claimants named only the employer as a defendant and prayed for judgment only against the employer. Claimants alleged that the employer was insured and that they were notified by letter from American International Adjustment Company, Inc., that their demands for death benefits were being denied. Claimants' discovery pleadings were directed to the employer and to the adjustment company. At trial, it was stipulated between claimants and the employer that National Union Fire Insurance Company provided worker's compensation insurance to the employer at the time of Rochelle's stroke. The only answer to claimants' petition was filed on behalf of the employer and the adjustment company. The stipulated worker's compensation carrier, National Union, never appeared in the action in any manner except for the stipulation, and claimants never joined either the adjustment company or National Union as a party defendant.
The answer and the objections to discovery by the employer and the adjustment company do not make the adjustment company either a party defendant, an intervenor, or the worker's compensation insurer of the employer. Even though the adjustment company "appears" in the record in the manner stated and National Union is stipulated to be the employer's worker's *145 compensation insurer, neither the adjustment company nor National Union is a "party" to the action who can be cast in judgment.
Where a liability insurer of a named defendant tortfeasor has been named by its insured as a third-party defendant, judgment on the main demand in favor of plaintiff cannot be rendered against the liability insurer even though the insurer is cast in judgment in favor of its insured on the third-party demand. Heckel v. Travelers Ins. Co., 340 So.2d 363 (La.App. 1st Cir. 1976); Kling v. Collins, 407 So.2d 478 (La. App. 1st Cir.1981). Even though worker's compensation coverage is stipulated, the insurer cannot be cast in judgment where plaintiff has not joined the insurer as a defendant. Any judgment against the non-joined insurer is null. Brock v. Tidewater Construction Company, 318 So.2d 100 (La.App. 3d Cir.1975).
The adjustment company is not the worker's compensation insurer who can be assessed penalties under § 1201. The insurer is not a defendant and cannot be assessed penalties under the authorities cited above. The defendant employer cannot be assessed penalties on this record because the delay in the payment of benefits by the adjustment company is not shown to have been legally attributable to the employer.
Attorney fees may be assessed only against an insurer or against a self-insured employer. § 1201.2. Decedent's employer, stipulated by claimants to have been insured, is not a self-insured employer and cannot be assessed with attorney fees. The employer's insurer, National Union, is not a defendant and cannot be assessed with attorney fees. The adjustment company is not the employer's insurer and cannot be assessed with attorney fees.
The trial court's result as to attorney fees and penalties is correct and is affirmed, notwithstanding that we assume the failure to pay benefits was not warranted under the statutes. See Caldwell v. Second Judicial District Indigent Defender Board, 475 So.2d 96 (La.App. 2d Cir. (La.App. cir. if as) 1985), writ denied; Ogden v. Dalton, 501 So.2d 1071 (La.App. 2d Cir.1987).

DECREE
At the cost of the employer, the judgment appealed is AFFIRMED.